## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

Rico CARLOS NEWMAN  )
         )
_____, )
         )
*(Enter full name of Plaintiff(s))*  )

**Civil Case No.** 2:19-cv-01081-MC
*(to be assigned by Clerk of the Court)*

**Plaintiff(s),**       )  **COMPLAINT- U.S.C §1983**

   v.         )_____

OREGON DEPARTMENT OF CORRECTIONS -et al.

Colette S. Peters -Director, Braid Cain -Superintendent, Paula Myers -Superintendent, Lisa Koltes -Medical Provider, Garth Gulick -Medical Provider, all relevant T.L.C Committee members, Nicole Carr -Registered Nurse, (Nurse) Gillmore-Angels, Vishami Brady -Registered Nurse, Aja Villareal -Registered Nurse, Joe Defoe -Medical Services Managr, Christopher DiGiulio -Medical Director, (Dr. Peng), Rod McNitt -Corrections Officer, Kandy Shepard -Corrections Oficer, Monica Landerverde -Medical Services Manager, Dave Brown -Medical Services Manager, Joe Bugher -Health Services Administrator, Aimee Hughes -Medical Services Administrator, Jackie Wick -Registered Nurse, Debi Nicholson -Registered Nurse, Sheila Mecham -Executive Support Specialist, B. Greesbael, (Mr.) Geeir, John Doe(#1), Jane/John Doe(#2), and Jane/John Doe(#3)

*(Enter full name of ALL defendant(s))*

### Defendant(s).

Comes now, pro-se Plaintiff (Rico Carlos Newman, SID# 12397798), who presents the following civil

rights complaint, and claims for; compensatory, punitive, declaratory, injunctive relief, and any other

relief deemed just and proper, as follows (not limited to) :

### I. INTRODUCTION

CIVIL RIGHTS COMPLAINT (§1983)           1

1.  This action places before the court a lawsuit involving the administration of Snake River
    Correction Institute ("SRCI") and Coffee Creek Intake Center ("CCIC"),both prison facilities of
    The Oregon Department Of Corrections ("ODOC"), charged with custody and control of
    approximately 3,000 inmates, and the medical practitioners employed or contracted by ODOC
    to provide inmates with medical care.

2.  This complaint alleges that adequate medical care has been abridged – if not outright – refused
    by ODOC staff, in concert therewith it's contracted resident physicians (and or, other medical
    personnel).

## II. PARTIES

### PLAINTIFF

3.  Rico Carlos Newman ("Plaintiff") is currently serving a criminal sentence in the custody of the
    ODOC. At all times relevant to this action, plaintiff was housed at SRCI located at 777 Stanton
    Blvd. Ontario, Oregon 97914, or CCIC located at 24499 S.W. Grahams Ferry Rd. (excluding
    the few months Plaintiff was sent to Multnomah County Jail to address criminal matters, but not
    before being first sent to Malheur County Jail.

### DEFENDANTS:

4.  Defendant Brad Cain ("CAIN") was at all times relevant to this action employed as
    Superintendent of SRCI , and charged with custody and care of the plaintiff. CAIN is the
    facility's highest authority responsible for the appointment, employment, and oversight of
    facility's staff, and oversight of facility operations generally, and is the final authority over
    inmate institutional grievances and concerns. At all times relevant to this complaint, CAIN
    acted under the color of state law. He is hereby sued in his individual as well as his official

CIVIL RIGHTS COMPLAINT (§1983)                                        2

capacity, jointly and severely, for the acts and omissions described fully henceforth.

5.    Defendant Garth Gulick, M.D. ("GULICK"), at all times relevant to this action was and is a

employee or contractor employed by ODOC to provide medical care to the inmates of SRCI,

charged with the duty of providing professional  medical services of "General Practitioner" to

the inmate population. At all times relevant to this complaint, GULICK acted under the color of

state law and is hereby sued in his individual as well as his official capacity, both jointly and

severally, for for those acts and omissions described  herein.

6.    Defendant Lisa Koltes, M.D. ("KOLTES"), was at all times relevant to this action employed or

contracted by ODOC to provide medical care to the inmates of SRCI, charged with the duty of

providing professional  medical services of "General Practitioner" to the inmate population.. At

all times relevant to this complaint, KOLTES acted under the color of state law and is sued in

his individual as well as his official capacity, both jointly and severally, for for those acts and

omissions described  herein.[1]

### III. Jurisdiction and Venue

7.    Jurisdiction is asserted pursuant The United Stats Constitution and U.S.C. §1983, to redress the

deprivation of those rights secured by the United states constitution, deprived by persons acting

under the color of law. The court has jurisdiction over these matters pursuant to 28

U.S.C.§1331, 1343(a) (3).

8.    Supplemental jurisdiction is asserted pursuant to 28 U.S.C. §1367, such as state claims of

medical malpractice/negligence,etc. (but not limited to) which arise via violations of state law,

though allowsS federal courts to here claims arising under the laws of state, as long as the state-

---

1  See as: O.D.O.C (Oregon Department of Corrections),  S.R.C.I (Snake River Correctional Institution), C.C.I.C (Coffee
Creek Intake Center), T.L.C (Therapeutic Level of Care Committee, I.C.F/ "KYTE" (inmate communication form/
inmate medical request form), G.P. (general population), MED/ MEDS ( medication), c/o (correctional officer), R.N.
(registered nurse), M.S.M (medical Supervising manager), B.H.S (Behavioral Health Services), post-op (post-operative).

law claims arises from the same set of facts which give rise to violation of federal law.

9.    Plaintiff's claim for injunctive relief is authorized pursuant to 28 U.S.C.§2283, 2284.

10.    The United States District Court of Oregon, in the County of Multnomah, city of Portland, is
the appropriate for trial pursuant to 28 U.S.C.§1391(a) (b); The counties of Malheur and
Clackamas are where the events complained of have occurred.

### IV. Previous Lawsuits

11.    Plaintiff has never before filed a civil suit, nor has there been previous litigation regarding any
of the issues described in this complaint.

### 12.    V. Statement of facts

13.    On or about July 18th 2017, at CCIC, Plaintiff suffered severe physical injury and trauma as a
result of an untreated malignant condition, which subsequently caused plaintiff a fall and
collision, harming him and further damaging his preexisting back condition. As such, spinal and
nerve damage was sustained.

14.    Plaintiff was transported by ambulance to Meridian Park Hospital, located in Tualatin, Oregon,
where he received medical treatment for his injuries, a referral for a follow up appointment, a
referral for physical therapy, and prescriptions for medication to treat: inflammation, muscle
spasms, and pain. Finally, medical staff recommended (*i.e.*, MRI or CT scans) in the case
Plaintiff's conditions did not improve.

14.    On September 7, 2017 plaintiff was examined by Mr. Stevens ("STEVENS"), a licensed
physical therapist. The exam revealed plaintiff suffered damage to both vertebrae and    nerve.
STEVENS recommended plaintiff be evaluated by a neurologist specializing in   spinal injuries and

CIVIL RIGHTS COMPLAINT (§1983)                                              4

reconstructive orthopedic surgery. STEVENS additionally recommended a follow up appointment. No follow up appointment was scheduled by     SRCI medical staff.

15.    Plaintiff did not receive his first visit with neurosurgeon Dr. Kenneth Little, M.D.

("LITTLE") until after plaintiff continued to endure and complain of pain and suffering.

16.    On December 12, 2017 plaintiff had a MRI examination at "Imaging Center of Idaho."  The examination revealed plaintiff to have been suffering from an "L4-L5 mild lithiasis. Circumferential bulging of the disk...crowding the central L-5 nerve root. Narrowing of the subarticular recesses...narrowing of the central canal. There is only a thin rim of residual perineural fat surrounding the existing roots...*severe* bilateral stenosis.

M.R.I **(IMPRESSION): "**M.R.I of the lumbar spine most noteworthy for degenerative changes at L4-5 and L5-S1. At L5-S1 there is resultant bilateral severe foraminal stenosis, and at L4-L5 bilateral severe foramenal narrowing..." In layman's -as was explained to plaintiff by Neurosurgeon LITTLE, Plaintiff suffered from disk herniation at the 4th and 5th disks of his lower lumbar/ spine, causing the Sciatic Nerve "S-1" to be pinched, coupled therewith, severe narrowing of the nerveal canal "severe stenosis".  preoperative diagnosis was that, "Left-S1 far worse than right-S1 radiculopathy secondary to broad-base L5-S1 disk herniation, eccentric to the left." Necessitating invasive surgical treatment. In Dr. LITTLE's oral prognosis of plaintiff, he concluded that the injured tissues could and would most likely continue to worsen and weaken by ineluctable strain on the damaged disk/vertebrae/nerve/ and or ligaments and facet joint capsules of the fourth and fifth lumbar posterior spinal column -as well as both ends of the narrowing nerval canal. LITTLE concluded that, over time the pressure on nerve ending with severe bilateral foramenal stenosis at plaintiff's level,would over time increase and accelerate and deterioration will ensue if not rectified promptly.

**15.**    LITTLE explained to Plaintiff that as Plaintiff's spinal integrity degrades, Plaintiff's pain would

CIVIL RIGHTS COMPLAINT (§1983)                                                    5

become increasingly severe, and Plaintiff's mobility would become increasingly restricted. Further, LITTLE explained to Plaintiff how spinal movement (including; bending over, twisting and side bending,etc.) may diminish to the severity of permanent damage, and or, paralyzation, if Plaintiff's condition remains untreated (in regard to the nerve damage -and or- spinal stenosis). Finally, LITTLE found that as 4th -and or- 5th vertebrae continue to pressure surrounding nerves and musculature, painful spasms and inflammation could be expected with more frequency.

16.    LITTLE presented Plaintiff with two treatment options : the first non-surgical, the second spinal surgery. The non-surgical procedure being an epidural (steroidal injection in the spine), which LITTLE deemed to be fruitless and redundant -being that the Plaintiff's injuries were so far along, surgical intervention was inevitable. This first said remedy, while potentially relieving immediate nerve/muscle/ligament and or joint pain, would ultimately yield no long term benefits, and would simply mask the pain and symptoms while the crux of the plaintiff's conditions would be further perpetuated and exacerbated (as it had already been for close to two years). The second option was that plaintiff forego spinal surgery and receive a "...left L5-S1 HEMILAMINECTOMY and MICRODISKECTOMY" (where a small incision is made on the left side of the lower lumbar (spine), serial dilating tubes are guided down the left L5-S1 interlaminary space under fluoroscopic guidance (in plaintiff's case, the operating microscope was brought in the filed to aid with magnification for microsurgical techniques). In layman's, portions of the bulging spine was ground down and removed using a drill, then extracted. LITTLE had also cautioned the plaintiff that the "surgery might not take"-yielding a futile procedure. In that event, which surgeon stated was highly likely in plaintiff's case, a second surgery of the similar manner would be required. And if the second surgery did not take, then spinal fusion would be necessary.

CIVIL RIGHTS COMPLAINT (§1983)                                                    6

17.     Granted the severity of plaintiff's condition necessitating the drastic measures of back-surgery,

the totality of the matter is nearing three years and plaintiff's spinal stenosis (narrowing of the

nerval-canal) has yet to be addressed. Further, LITTLE opinioned that only time can tell if

damaged nerves are too fully recover, and that all depends or the level of trauma  sustained over

the extended period of abuse from the herniated disc perpetually assaulting the nerve, and the

individuals capability to heal.

18.     While either option could potentially remedy plaintiff's ailment, the second option was found by

LITTLE to be the superior and most objective course of action. Thereby, recommended the

surgery.

19.     Plaintiff was scheduled for surgery to occur at St. Luke's Hospital (Boise Medical Center

-Boise, Idaho) on June 21, 2018. Plaintiff's medical procedure, and hospital course there after,

was uneventful with no complications.

20.     In the days following plaintiff's surgery/discharge from hospital, he was subjected to subjected

to further unnecessary and wanton infliction of pain, be that numerous post operative

prescriptions and or recommendation from LITTLE said to aid in plaintiff's recovery and

rehabilitation failed to be followed by KOLTES and GULICK, if not out rightly disregarded

with deliberate indifference:

*a) As where, Plaintiff was prescribed pain medication (HYDRO-CODONE/ NARCO -325mg.)*

*1-2 tablets every four hrs. as needed for pain(per Dr. Little/surgeon), but was only given the pain*

*medication 3(three) times a day (at appropriately 7a.m./12p.m./7p.m-or-9p.m.), with a maximum time*

*of 10 to 12 hours window between plaintiff's last dose of the day, and his first dose the next day. By*

*that, causing plaintiff great suffering in severe and extreme pain all through the night, losing drastic*

*amounts of sleep, and waking up in excruciating pain.*

CIVIL RIGHTS COMPLAINT (§1983)                                                    7

b) As where, O.D.O.C Medical Services personnel Jane Doe erroneously and without documented authorization, changed the prescription of Plaintiff's pain medication ("NARCO") to be provided every 4-hours (as ordered by his Neurosurgeon -Dr. Little), to be provided every 6-hours.

c) As where, Lidocaine-Patch were prescribed by Dr. Little to be provided to the plaintiff daily, post-operative, to aid with pain and nerve damage. The patches were to be provided from June 22nd 2018 to July 22nd 2018. Plaintiff was never provided with any patch, or any other form of Lidocain from O.D.O.C Medical Services.

d) As where, a neurological medication ("GABAPENTIN"OR"NEUROTIN") known to help with nerve pain was prescribed by Dr. little, post-operative, be that he noted in Plaintiff's medical records that the nerve/pain med was provided to him at prior to his surgery (Further, Dr. Little affirmed with Plaintiff that up until that point of all pain medications provided by O.D.O.C medical services, this med helped the most).

e) As where, Amber Dysart, O.T.( Occupational Therapist -of St.Luke's Hospital's "Physical Medicine and Rehabilitation" team) in her evaluation's conclusion stated, "Pt. (plaintiff) needs assistance to boost to stand from low surfaces. O.T. recommends pt. Have access to sock aid and long handled shoe-horn, elevated seat with arm rest or grab bar, and handicap (seated) shower area when returned to facility (none of the afore mentioned recommendations were provided to the Plaintiff by O.D.O.C Medical Services, except the seated shower area – be that they are in every unit at Snake River Correction Institution) (thus, causing Plaintiff further pain from re-injuring himself while attempting to take off his shoes and socks on the night of August 7th 2018, just weeks after surgery) (the lack of O.D.O.C/ Medical Services providing the plaintiff with any of these before stated Neurosurgeon's prescriptions can be attributed to their cognizant and malfeasance).

22.     Prior to plaintiff's traumatizing fall from the top-bunk ladder onto stainless steel toilet face, he

CIVIL RIGHTS COMPLAINT (§1983)                                                                8

had complained adamantly, both orally and in writing to Security staff/administration and Medical
Services. Over the course of approximately a year that he was suffering from a long standing serious
medical need caused by a physical injury that was sustained while preforming a work detail (lifting a
mop bucket up out of an unsafe sink that forces you to lift with your back,not your legs) at O.D.O.C
Snake River Correctional Institution – on or about June 1ˢᵗ 2016. At best, O.D.O.C therewith Medical
Services was reluctant to take serious the magnitude of plaintiff's plight, and wantonly slow to provide
even 'proforma care' for plaintiff's medical concerns and symptoms of continuous pain and suffering.

23.     From appropriately June 1ˢᵗ 2016, plaintiff had surmised there was some form of neurological
deficiency in his lower back, and had asserted such through numerous -channels to include Doctors
GULICK and KOLTES, et al. This was accomplished by plaintiff submitting a multitude of; "Health
Services Request Forms", "Inmate Communication Forms ", letters to medical and security
administration  officers, as well as oral complaints to both medical/security (when requested, plaintiff
was never afforded the opportunity to speak with anyone in administration). These stated channels
being plaintiff's only means by witch to cordially and informally address matters of serious concern
should have been heed with reverence, but were met with arbitrary placation. From approximately 06-
01-2016,and forth, this matter has been an ongoing and continuous occurrence in which plaintiff has
been adamant and diligent in voicing the presence of a serious medical nee, and his desire to have his
condition adequately treated and rectified.

24.     **PREQUEL OCCURRENCES** - The fall and subsequently injury giving rise to plaintiff's
complaint (but not limited to) transpired on July 18ᵗʰ 2017, but was subsequent to a longstanding
medical condition causing neurological deficiency that plaintiff has been enduring since approximately
June of 2016. Plaintiff's first personal recorded record in regard to this matter was an" Inmate Request
Form" (please see herein as "IRF") dated July 25ᵗʰ 2016. Shortly there after, plaintiff was scheduled for

CIVIL RIGHTS COMPLAINT (§1983)                                        9

"sick call" where he seen by a R.N. (Registered Nurse) whom provided an oral inquiry in regard to plaintiff's symptoms, then sent him on his way without being treated, but instructions to take it easy and he could obtain Aspirin/ Non-Aspirin and Ibuprofen on his housing unit. Plaintiff was not scheduled to see a doctor/ medical provider (Dr. Koltes) until about a month later (08-23-2016), which was due to a number of IRF being submitted after nothing more had been done for plaintiff's injury by medical – but the severe pain continued.

25.    August 23rd 2016 plaintiff was seen by KOLTES, where he reiterated explained to her his ongoing issues and symptoms. KOLTES assured plaintiff that it was likely just a muscle strain, but would but would schedule an X-ray to make sure nothing was broken. Plaintiff's rebut to this said course of treatment was that he did not feel like anything was broken or felt no muscles pain or strained, but more so that a nerve was pinched. That he would lose control of his lower extremities – causing him to fall down when he; sneezed, coughed too hard, and at times when he moved too sharply. KOLTES stated that she did not concur with plaintiff's 'pinched nerve theory' do to, as she stated, "reflex" would show signs nerve damage "but you don't show any of those signs or symptoms."

26.    August 27th 2016, several x-ray were taken of plaintiff's back, which subsequently resulted in Plaintiff receiving a Test Results Communication Form" (via prison mail) on 08-31-2016 stating, "Mr. Rico, your back X-ray dose not show instability in your spine nor any bone abnormalities. You may have mild disc-space narrowing at L5-S1."

27.    On September 1st 2016, Plaintiff submitted another IRF to Medical Services expressing that he was in horrendous pain. This time, specifically requesting for an M.R.I – but too no avail. Plaintiff was schedule for "sick call" to speak to a nurse, but nothing became of that visit except further placation – no treated was provided. Plaintiff's unrelenting assertions of being in extreme pain and pleas for adequate medical care continued to go unheeded.

CIVIL RIGHTS COMPLAINT (§1983)                                    10

28.    On September 20th 2016, submitted another IRF regarding his back pain to medical after he had

been placed in D.S.U (disciplinary segregation, subsequent a fight he was involved in). Plaintiff was

not scheduled to see the medical provider until October 11th 2016. Once seen by Dr. GULICK, Plaintiff

was told by him that it was likely only a strain and he could get Ibuprofen and aspirin off of the

medication cart when ever it came around if the pain continued. Plaintiff informed him that this same

statement had already been stated to him by KOLTES, and that he was vary sure it it was definitely not

a muscle strain, and that Ibuprofen/Aspirin was doing nothing for his severe pain thus far. Plaintiff

again requested to receive an M.R.I and too be seen by a back-specialist, but was denied both requests

-including the providing of pain management medication, stating that "T.L.C (Therapeutic Level of

Care committee) is not going to authorize it. Your symptoms don't meet the criteria for justifying the

necessity for an M.R.I. ...Plus, your mobility is too great for me to even approve a request to the T.L.C

for an M.R.I at this time...but if you still want me to, we can put in a request to the T.L.C, knowing

they'll deny it. Further, GULICK went on to rationalize his conclusion by stating, "...you wouldn't have

been able to fight like you did if you had a pinched nerve in your back." Again, Plaintiff was not

adequately treated, nor did plaintiff's concern receive any true reverence.

29.    After some time, a request was put in by either GULICK or KOLTES to the T.L.C for an M.R.I

for the Plaintiff. It was denied. On the bases as the T.L.C stated on their "T.L.C Decision

Communication" form "MRI LS-spine was not approved", "observe longer". The decision dated

December 7th 2016 (Plaintiff was informed by KOLTES that at least three requests for M.R.I were

submitted and denied by the T.L.C).

30.    While in segregation plaintiff voiced to medical personnel and security officers on numerous

occasions, both orally and through written submissions, the extreme and immense pain he was

suffering from. Too no avail, in adequately treating an evident physical injury that any reasonable

CIVIL RIGHTS COMPLAINT (§1983)                                                    11

doctor, patient, or otherwise observer would find important and worthy of comment and treatment. Thereby, justifying and supporting plaintiff's claim of a "serious medical need". These pleas of injury continued to go unheeded and or inadequately treated, regarded the magnitude of plaintiff's plight plead, or the evident need for serious treatment.

31.    Back in "G.P." (general population), plaintiff adamantly continued to assert the fact that his medical condition was becoming malignant. Too, IRF submitted and dated 12-20-2016 & 02-21-2017 plead for "HELP" and relief from ongoing and continuous "EXTREME" and "EXCRUCIATING pain" and suffering. To no avail.

32.    Be that plaintiff felt he was receiving no true, reasonable, or adequate medical treatment from O.D.O.C Medical Service, through despondency, he felt compelled to seek remedy through a formal authority – via administration.

33.    01-27-2017, Plaintiff submitted a correspondence to Warden/Superintendent of S.R.C.I Braid Cain (henceforth as "CAIN") regarding the matter at hand. Cain's response came by way of S. Mecham -a delegate whom signed and dated (02-06-2017) the response and returned the correspondence about ten days latter. The response stated that "The superintendent is not over health services. If you feel you are not getting what you need from S.R.C.I Health Services, you can write to Mr. J. DaFoe -Health Services Administrator."

34.    On or about 02-03-2017, Plaintiff sent his first IRF correspondence to Dr. Joe DaFoe – per CAIN, which was returned to Plaintiff with a convoluted response, misdirection and deviation from true the matter at hand or as presented to him in form.

35.    02-17-2017, plaintiff had an scheduled appointment with KOLTES. The visit consisted of the same/similar arbitrary and painful physical examination: range of motion/reflex tests etc. Prior to this

visit plaintiff was in extreme pain and made this clear to KOLTES. Realizing nothing new or of great benefit was coming from this continuous and additional pain KOLTES was subjecting him to through her repetitive – futile and inadequate chosen course of treatment (via, examinations). Plaintiff became highly agitated/aggravated and respectfully voiced his contempt toward the performa treatment he was receiving, stating the pointlessness of these repetitive examinations was doing nothing to address the true issue(s) of concern: plaintiff's feeling of a pinched nerve in his back.

In turn, KOLTES became flustered and stated, "I don't think you're being totally forthcoming, and I feel you're over stating your injury." KOLTES went on to say how the plaintiff was making it harder on his self by not being cooperative with his examination. Plaintiff's rebut was too explain that he was and had been "cooperative" for the last year, but the redundant and arbitrary examinations be forced upon him were doing nothing but causing him more and unnecessary pain, and would do nothing to help his medical condition in the long run.

36.    On or about 03-23-2017, Plaintiff sent a second IRF to Dr. Joe DaFoe addressing the vague and arbitrary response provided to plaintiff's initial correspondence - that response being, "The Therapeutic Level of Care Committee has reviewed your medical concerns regarding your back. T.L.C did non approve either surgery or an M.R.I ", a fact well known and already apparent to the parties involved (a response not written or signed by Dr. DaFoe, but a delegate).

37.    March 4th 2017, plaintiff sent a ICF to Nurse Landeverde, Medical Services Manager stating plaintiff's desire to  file a formal complaint against KOLTES for not taking plaintiff's repeated and adamant claims of severe injury seriously, as well as her disrespecting plaintiff to his face, by stating: "I don't think you're being totally forthcoming, and I feel you're over stating your injuries." In response Nurse Landeverde apologized for KOLTES' disrespect, and asked plaintiff to "allow" KOLTES to examine plaintiff's back at his next appointment with KOLTES.

38.     03-27-2017 (approximately 8:20am), officer Jennings queried the plaintiff about the condition of his back injury as he abstracted him from his cell to escort him to his shower, be that he observed plaintiff's precarious state. officer Jennings queried "so... your back not feeling better yet?" Once plaintiff assured him it was not, Jennings inquired further, "have you seen a doctor about that? It looks like you should really get that checked out...gone unchecked, it could get a lot worse." Plaintiff assured him that he had, and had done all he could to obtain adequate treatment, but would continue to seek rectification.

39.     03-27-2017 (approximately 3:15p.m.), officer S. Stanton was making his rounds with the supply cart, to provide any needed daily supplies for inmates in disciplinary segregation units. When he gets to the plaintiff's cell (DSU-C/A-Side/#31), he gives plaintiff two packets of Ibuprofen and two packets of non-aspirin. When plaintiff asks for a few more of each, Mr. Stanton's reply was "that's all we're allowed to give you per day...but ...O.K. I'll give you a few more since you have a hurt back." Plaintiff thanked him kindly.

40.     03-28-2017(at approximately 12:20p.m.), plaintiff asked officer Jennings for advice on what would be the most conducive way of going about seeking to obtain adequate medical care without filing formal grievances and any subsequent law suit as ramification. Officer Jennings then stated to the plaintiff that in the 16-plus years that he had worked for O.D.O.C, in his experience, if the plaintiff had not gotten any help after thus far, the best thing for him to do would be to file  grievances, and in the case that didn't work then file civil suit.

41.     03-28-2017, (at approximately 2:00p.m.), plaintiff met with GULICK to confer on his medical condition and concerns. He expressed to GULICK the extreme and excruciating level pain he was enduring, and the  many other symptoms experienced which raised alarm. The topic of the three patient/doctor requests for the plaintiff to have an M.R.I and to see a back specialist which were

CIVIL RIGHTS COMPLAINT (§1983)                                    14

submitted to the T.L.C (and subsequently denied) was breached. The reasoning of the denials, as stated

to the plaintiff by GULICK, was that "the T.L.C doesn't feel you're (plaintiff) ready for surgery, and

M.R.I's are much too expensive to give to inmates that aren't candidates for surgery." Plaintiff then

expressed his discourse and objected to said reasoning on the merits of;  level of pain and suffering,

prolonged period of time in pain, symptoms of: numbness and tingling down legs (predominantly

left)/shooting pains/lack of strength/falling down/etc. GULICK's rebut went as such:

- O.D.O.C  policy does not allow doctors to gauge inmate injuries  level of severity of
  by "pain level" any more, only "function-ability";

- "no matter how much pain you 'claim' to be in, we're (O.D.O.C/Medical Services)
  not gonna do anything for you because you function too well.";

- "If you're able to walk down here and back on your own,you're fine. There's nothing
  wrong with you;

- Plaintiff's medical history shows that he had more function than he claimed (the
  basis for this stance was a fist-fight which transpired 6-months earlier, that the
  plaintiff was involved in. GULICK stated numerous times that there were "multiple
  occurrences" that had shown plaintiff had more function than claimed, but the only
  evidence given as an example was the fight);

- plaintiff's past history with medication misuse as a reason to believe plaintiff was
  "not being truthful" about his claims of injury. When plaintiff inquired what a 3-yr.
  Old mishap with his physiological mood-stabilizing medication had to do with a
  pinched nerve in his back at the present, the question was diverted by GULICK
  stating "you don't have a pinched nerve in your back!", which was totally contrary to

CIVIL RIGHTS COMPLAINT (§1983)                                    15

what had been stated to the plaintiff by GULICK during a prior medical appointment. GULICK had stated prior that it was his assumption that the plaintiff likely had a pinched nerve at the S-1. When confronted with this fact GULICK paused briefly, mused through plaintiff's medical file for a moment, and then stated "Oh yeah, I guess I did...but only a partial pinch...and at the S-1 (he corrected plaintiff-L-5/S-1)";

- GULICK states that " Only 80% of patients with back pain show-up on M.R.I, so it would be a waste of money and time to provide one for the plaintiff since he only had a partial pinch. Plaintiff did not concur, and asserted such by stating he just needed help for his precarious condition through adequately medical care, and had never came look for "drugs" (narcotics) from him, and there was no premise to assume he was faking a back injury for nearly a year. Plaintiff again appealed that he be allowed to be evaluated by a specialist which was apathetically denied when GULICK stated "NOPE, but I can put you on this new medication that's a great pain-blocker -Duloxetine... (which ended up having extreme adverse effects to plaintiff's vision and other motor functions).

- GULICK states "...it's not that we hate you, we don't hate you guys. We just can't do anything for'ya! Not at this time... Especially not with only signs of partial lose-of -feeling. We would have to wait until you have total lose of feeling and total lose of function before you would even be an 'operable candidate'.

**42.**     03-28-2017 (approximately 2:30p.m., after appt. with GULICK), Officer M. Bennett escorted plaintiff back from medical to his cell. When c/o Bennett seen the evident dejection on

plaintiff's face, he stated "so.. . I take it you didn't get any good news from the doc' today from the looks of you..." Plaintiff replied,"No Sir, same'ol madness as every other time I've came down here (to medical) in the past '100-years' (said with sarcasm). C/o Bennett chuckles, then states "yeah... Jennings (Officer Jennings, who worked 5-days a week/ 2nd shift0 told me you've been having some serious back pain or what ever going on for quite a while now." Plaintiff's reply, "yes Sir., I been trying too get these folks (medical/GULICK/KOLTES) to do something about this tremendous back pain for about a year now! But too no avail... It's too the point where I Feel like my whole back is deteriorating a lil'more each day." C/o Bennett states, "Yeah I can see. I can tell by the way that you're walking." There was other brief dialog before plaintiff asked, "what is you guy's policy (O.D.O.C/ officer's) on advocating for inmates in situations like as this, and being a witness, in our (inmates) defense...if it ever came too that?" C/o Bennett took a deep breath and sighed before stating, "Well, in my experience, they (the courts) don't ever really ever call on us. They seem to vied it as an issue between the inmate and medical. Nothing to do with us (officers). ...I don't know, I couldn't really tell'ya for sure, but the only way I've ever seen guys that are getting the 'run-around' (from medical) get any real help for their problem(s), is when they have their family or people on the street hounding these guys (medical) about the issue. Then, you **might** see some results...other than that, you're pretty much screwed. ...Well from my experience anyway."

43.    03-28-2017, an ICF was sent by plaintiff to M.S.M (Medical Services Manager) Landaverde in response to (her) Landaverde's reply letter. Plaintiff's ICF cataloged the essence of the many adverse issues totaling his precarious medical condition, symptoms he was experiencing, and the lack of adequate care being provided by S.R.C.I Medical Health Services. Landaverde's response came back on 03-31-2017 stating, "I have received your medical record.

At this time our providers can not find any support for an M.R.I or for you to see a specialist. Place (continue) to work with Dr. Koltes on your medical needs."

44.      03-29-2017 (approximately 2:00a.m.), Plaintiff woke-up with tremendous aching and throbbing-pain in his lower-back (with 'pins & needles shooting down legs/ too, a feeling of compression by something squishing a nerve causing white-hot fire type sensation.),  now aware of the feelings of being subjected to both physical turmoil and mental anguish. Both emotional and spiritual; despondency, dejection, depression, and duress was now viable, in part caused by the previous day's third denial of plaintiff's continuous and adamant pleas for; M.R.I, to see aback specialist, or **any** other form of objective and adequate medical treatment.

45.      03-30-2017 (approximately 7:15a.m.), in an ICF sent to Medical Health Services plaintiff started experiencing side-effects from the "new medication that's a great pain-blocker pain/nerve medication- Duloxetine" prescribed by GULICK on 03-28-2017. the adverse side-effects varied; visual, nausea, hot/cold-flashes, jitters, etc. (visual issues the most prominent).

46.      03-30-2017(approximately 3:30pm), plaintiff received written medication instructions via 'jail-mail'. They cautioned that "possible side effects " may be "deadly". Which was never told to the plaintiff prior to administering. At this time plaintiff felt obligated to send a request in that this medication be canceled and replaced with an alternative medication that did not have death as a possible side-effect.

47.      30-31-2017 (approximately 7:00am), experiencing ineffable pain and discomfort upon waking. While under great duress, with the feeling of despondency, and feeling his only options were either continue suffering in extreme pain, or take the pain/nerve  medication prescribed by GULICK, plaintiff oped for the latter, be that the physical state plaintiff was in was unbearable.

**48.**        04-01-2017 (approximately 8:50am), while plaintiff was taking his morning shower he

sneezed, he felt a sharp pain and something in his lower-back pinch, his leg/legs gave out and

he fell naked to the cold and grimy stainless steel floor of the shower. This was not the first time

such an incident had occurred, but it was the first time plaintiff had documented it in his

personal log. Though, through ICF and orally plaintiff had previously made medical aware of

such episodes reoccurring .

**49.**        04-03-2017, plaintiff sent a second ICF to medical in regard to the medication

(Duloxetine) that was prescribed him by Dr. GULICK, and the adverse side effects he was

experiencing. The response came back on 04-07-2017 stating, "you have been scheduled with

the  doctor."

**50.**        04-11-2017(approximately 3:30pm), plaintiff was finally seen by GULICK, The matter

of side effects experienced from the Duloxetine was addressed. GULICK stated, "...I know you

were a candidate to show signs of side effects. About every 1-out of-6 patients show signs. that's

why I started you out on a low dose, I give most people 30mg._ but I gave you only 20mg .

Plaintiff was on this medication for over a week before he was taken off of it.

**51.** 04-11-2017 (approximately 3:30pm), while at the same appt. with GULICK, plaintiff rouse

mention to the issue of being in extreme and severe pain, and in great need of adequate medical

treatment. GULICK's reply was "...we (O.D.O.C/ Medical Health Services) don't treat pain. We

only treat for function. Feed/bathe/and dress your self, that's all you need to be able to do- that's

today's standard for medical care in prison...any thing (O.D.O.C/medical) other than that is a

luxury. Technically, we don't even have to treat 'partial injuries'...with your partial injury, you're

not gonna get a M.R.I, and you're not a candidate for surgery. So, all we can do for'ya is 'pain-

management...but since you're having side effects to the Duloxetine, there's nothing else I can

give'ya- that was our last hope. And because you only have partial injury I can't give you any type of narcotics. So there's nothing else we can do for'ya. This is just something you're gonna have to learn to live with."

**52.**     Between the dates of May 12th, 2017 and July 11th, 2017, plaintiff was placed on transport to be transferred. Plaintiff was transferred; from O.D.O.C custody (via S.R.C.I) to Malheur County Jail, from Malheur County jail back to S.R.C.I (O.D.O.C), from S.R.C.I (O.D.O.C) to Coffee Creek Intake Center (C.C.I.C), from C.C.I.C to Multnomah County Detention Center (M.C.D.C), from M.C.D.C back to C.C.I.C, and subsequently, from C.C.I.C back to S.R.C.I (where plaintiff is currently housed). All this while plaintiff is suffering from a serious medical conditions that has gone inadequately treated, too, in severe       and extreme pain. Which was evident by the extent that, during transportation the plaintiff received aid from the use of a cane, the assistance of transport officers to help him on and off the buses, and during transportation was only restrained minimally- in contrast to the full restraints of the majority of other inmates, and the severity of plaintiff's custody level. This was contributed to the fact of plaintiff's vary limited function-ability and lack of mobility, caused by plaintiff's back injury.

**53.**     06-09-2017 (approximately 5:45 am), plaintiff was in the custody of M.C.D.C and in rout to being transported to court from unit-6D/cell-30, while being escorted by Officer Warknock to the court's holding cells. Upon the routine "pat-down/ frisk" Officer Warknock made mention of plaintiff was wearing a back brace (prescribed and provided by Dr. Angelina Platas, MD). Mr. Warknock asked what it was for, and plaintiff replied that it was for "a lower-back injury that I got while working state-side (O.D.O.C). The doctor (GULICK) told me that he thinks I may have pinched nerve at the L-1 (L5-S1), whatever that means..." Mr. Warknock

went on further to state that, "you best make sure you they (O.D.O.C) do something about that A.S.A.P- they got the money. Because injuries like that gone unchecked, will more than likely cause permanent damage. Any doctor should know that- including jail/prison doctors. So they got no reason not too try fixing you right-up." Prior to this encounter, Mr. Warknock and plaintiff had never met, though Mr. Warknock put voice to the plaintiff's sentiments exactly, which is one of the reasons the statement resonates.

54.     Throughout plaintiff's approximate two month stay at M.C.D.C, numerous medical health requests were submitted in regard to plaintiff's back injury and it's adverse effects on his physical and emotional condition. In that brief two month stay, plaintiff received greater reverence and treatment for his unstable back condition than he had from O.D.O.C Medical Health Services (at S.R.C.I). Plaintiff was prescribed on June 5th 2017; a back brace, a restriction from upper-bunk/upper-tier (known as "lower-lower"), an extra pillow/blanket (to take pressure off of his lower-lumbar by sleeping with it folded and wedged between the legs), and was in the process of getting the plaintiff into being seen by a physical therapist.

55.     07-12-2017, plaintiff sent in his first medical ICF at Coffee Creek Intake Center in regard to the matter of his back's condition, and the fact that he had been Doctor restricted from being housed on a upper-bunk/ upper-tier (too include several other medical orders). C.C.I.C Medical Health Services personnel were made aware of plaintiff's issues and their ongoing occurrences at the time of his initial intake medical interview. Plaintiff sat in the nurse's intake office while going over his medical history/records, and while the nurse phoned Multnomah County Detention Center three (3) different times until it was confirmed that the fax of plaintiff's medical file had indeed been received. At that time, Medical was noticed. Plaintiff was seen two days later (7-14-2017) but none of his requests were acquiesced. Plaint received

no adequate treatment at that time.

56.        07-18-2017), Plaintiff's was still assigned to a top-bunk (unit-O/cell-105/bunk-A) at

C.C.I.C. During the daily 11:00a.m. Count fell an approximate 4-5 ft. from the ladder of the

upper-bunk. The fall caused him to bash and grind his spine down the face of a stainless steel

toilet. Too, further scrapes/abrasions and bruising to his left elbow was sustained as a result of

his fall to the concert floor. This was all subsequent to malfunction of the hand-rail, failing and

coming completely free from the wall as plaintiff grasped for the rail as a last hope to regain

balance. This fall was due to plaintiff losing control of his lower-extremities, and his legs giving

out caused by a nerve pinching in his lower back (L5-S1) after he sneezed, (At a later date, this

incident was further for pursued through O.D.O.C grievance process, and all levels of the

grievance process were concluded- but too no avail. Thereby, exhausting all administrative

remedies).

57.        Officer Craig (the unit officer on duty, and doing count at that time) had just

walked past the cell when plaintiff fell (it is O.D.O.C protocol that all inmates are to be up and

seated on their bunks at both 11:00am and 4:15pm and/or morning/afternoon count times). The

loud commotion of the stainless steel hand rail clattering against the concrete floor after failing,

coupled with plaintiff's sharp outcry of pain and inmate McKay's (Michael R. McKay-

sid#8333097) hysterically calling for assistance caused officer Craige to quickly return to

plaintiff's and Mr. McKay's cell door.

58.        Officer craige had arrived within seconds and promptly dispatched via radio for

immediate backup and that there was a medical emergency. During the approximate 30-minutes

it took for C.C.I.C medical team to arrive, only one other officer responded to officer Craige's

call for assistance- which was a officer G. West. Plaintiff continued to lay splayed out on the

cold concrete floor, while in immense pain, for over 30-minutes. Throughout that time, plaintiff received no assistance from the two officers other than them asking a series of random questions, but plaintiff was initially in too much pain to properly respond in turn. Further questioning was directed toward Mr. McKay, until finally, officer Craig came into the cell and stepped over the plaintiff's sprawled and withering body and retrieved the dislodged railing now laying still on the floor.

59.      After the approximate 30-minutes it took for medical personnel to arrive, plus a five-to-ten minute evaluation of the plaintiff, medical quickly came to the conclusion that plaintiff had sustained injury far grater than their limited expertise and resources could possibly provide. Subsequently, the Emergency Medical Services (E.M.S) was dispatched at that time. Ten-to-fifteen minutes later they arrived. The E.M.S did another quick evaluation, plaintiff was carefully rolled on his side, a flat "backboard" was slid under him, and he was rolled back down onto the board and strapped to it. By two emergency personnel's guidance plaintiff was then slid out of the cell. It took the assistance of about other people to then help lift the backboard/plaintiff onto an awaiting gurney. Plaintiff was then taken to C.C.I.C medical center were he was briefly evaluation by Dr. Peng, after by which he was quickly rushed to Merridian Park Hospital emergency room -via ambulance.

60.      There plaintiff received a through examination of his back and injuries. X-rays were taken and reviewed. It was found that plaintiff had sustained lacerations and abrasions on both his left elbow and over a thoracic portion of his spinal-cord. Some minor bruising and swelling was present on the suffice, but there was disc-space/narrowing in the lower lumbar reign found on the X-ray. Plaintiff was informed by the E.R. Doctor that nothing further could be definitively concluded as of the full extent of his injury(s), or the crux of the underlining and

preexisting problem without an M.R.I or further imagery, but it was his hypothesis that plaintiff was suffering from a pinched nerve. Which was the cause of plaintiff losing control of his lower extremities when the nerve would become further pinched by sneezing, coughing, and or certain movements, etc. Prior to plaintiff's discharge from the hospital, he was referred by the attending physician to receive an M.R.I of the lumbar reign in question,and be seen by a physical therapist as soon as possible. Plaintiff was also prescribed pain management medication and muscle relaxers (NARCO/FLEXERIL), in addition, he was ordered to continue taking the pain medication he had previously been taking (which was GABAPENTIN).

**61.**     Plaintiff had lain on the cold concrete floor with no feeling in his lower extremities,no feeling at except the intensifying feeling of horrendous pain coursing through his body, for the better part of an hour. Approximately 45-to-60 minutes.

**62.**     Subsequent the evident preexisting and well documented back injury which had been a ongoing and continuous occurrence, caused a serious medical need (well known by both O.D.O.C medical personnel and officials of administration alike), this fall on June 18th 2017 from 4-to-5 ft. ladder onto the face of a toilet (therewith failure of the hand rail) caused substantial additional injury to the plaintiff. Plaintiff did not receive his much needed spinal-surgery until June 21st of 2018, eleven (11)months and three (3)days later. Almost an additional year plaintiff was forced to suffer in physical pain, not to mention both the mental and emotional pains and strains which were sustained.

**63.** 07-19-2017, The morning following plaintiff's fall from the ladder, plaintiff's was denied pain medications/muscle relaxers (NARCO/FLEXERIL) which were prescribed to him by Merridian Park Hospital's emergency room Physician. This was due to the fact that the prescription was canceled prematurely (as was stated to the plaintiff by one Nurse BRADY, RN. When asked,

nurse Brady refused to answer by stating she 'could' not provide the name of the individual in question which authorized the cancellation, and the reasoning for the actions (it was later found at a later date by plaintiff -via Nurse Aja Villareal- that the cancellation was authorized by Dr. Peng,"PENG". The cancellation was done soon after plaintiff returned from the hospital, and before Dr. Peng and the plaintiff had ever met, or before Dr. Peng ever had the chance too evaluate him).

64.    Plaintiff spoke with PENG that same morning shortly there after- present therewith, nurse Brady. When the topic of the cancellation of plaintiff's medications was broached, PENG's rebuttal was, "...it is left up to the doctor's discretion what medications they provide (inmates), regardless what an E.R. Doctor may prescribe." Plaintiff, apprehensive of said statement, then requested for what was stated to him to put in writing (this request was given appeasement by PENG, but no further action was ever taken). PENG went on to state, "...I'll see what I can do..." The conversation went on to confer over the matter of plaintiff's use of a wheelchair being canceled, and substituted with a walker- which in turn was PENG's finial conclusion/order, even after plaintiff vehemently protested and expressed his concerns for; lack of stability,mobility, and capability to proper function-ability. Plaintiff also expressed clearly his concern for safety, if forced to to use a walker before his body was ready- and especially only after a short time after such a traumatizing and painful ordeal as being temporarily paralyzed.

65.    Toward the conclusion of our visit, PENG reassessed and retracted his initial findings, and changed his diagnosis/prognosis to the tune of, "...oh, it shouldn't hurt any thing if we allow Mr. Newmann (plaintiff) a few days of Narco."

66.    07-19-2017, plaintiff submitted a detailed ICF in regard to his request that he receive a copy of all his medical records dealing with and surrounding his back- injury(s). Two weeks

later he received a response stating that only 41-pages were found. Approximately a month the request for his records, he received the 41-pages, but noted that there were copies of any of his ICF which had been sent (along with other missing pages/documents/ and notes plaintiff feels should have been included -rectification was sought for the matter, but no reverence was ever provided).

67.        07-19-2017, plaintiff initiated the process of obtaining photographs of the open wounds/abrasions sustained on his spine and elbow, after his fall the day prior (07-18-2017). Pictures were not taken of the injuries until 07-28-2017, almost two weeks after the incident. By that time, plaintiff's injuries had already started the healing process, and scabbing had formed. Though pictures taken of plaintiff's mid-thoracic and elbow wounds are not as pink/raw and seeping as they initially were, the colored photos clearly and vividly show physical injury.

68.        07-25-2017, plaintiff informed Officer Robeless that the handrail in his new assigned cell (the cell next to witch he fell from the ladder) was also very loose and unstable. Ms. Robeless then checked the rail and confirmed that it was indeed unsafe, and assured him that she would make a call to the physical plant so they could come and fix it.

69. **SHOW NICK COPY OF MRI  RESULTS/date/person that did it/etc. -** 07-25-2017, Plan was in extreme pain, to the point of immobilization- incapable of making it the 40-or-50 feet it took to get to the 'chow' (meal) area for breakfast. Too, plaintiff was incapacitated to the extent that it took a great deal of assistance on the behalf on his cellmate (Mike Cisnero-SID#16914237) to help him use the restroom, and  not out without causing severe pain to the plaintiff. On duty  Unit Officer Craig,"CRAIGE"was made aware of  the situation (via Mr. Cisnero), and also inmate Mike McKay. CRAIGE dispatched for emergency medical assistance. Not once, but twice ( one Corporal Harry was present while three of the exchanges between

CRAIGE and plaintiff took place this day. Corporal Harry later informed plaintiff that he made a call to medical as well). Well over four (4-plus) hours pass with plaintiff in extreme pain, and with no medical care. A few hour had passed with plaintiff suffering in said state, before the pain subsided to the point were he was able to force himself through the pain and effort it took to make it to lunch and the officer's station. At that time, both CRAIGE and Corporal Harry were present as plaintiff inquired about O.D.O.C and Medical Health Services 'policy & procedures' on responding to an officer's urgent or emergency dispatch for inmate assistance. Plaintiff was told by CRAIGE, "I don't think we really have one...? they (medical) just, Kinda come-when-they-come." Corporal Harry concurred with this sentiment by shrugging his shoulders, and simply nodding his head up and down. Plaintiff inquired further, asking about O.D.O.C 'policy & procedures' for documenting or logging such an occurrence, and was given conformation by both CRAIGE and Corporal Harry that O.D.O.C has no such policy, nor do they have any operational procedure in place for these types of circumstances... Approximately 10-to-15 minutes later, after plaintiff had concluded his inquiry and went back to his cell still in great pain and no further assistance, Nurse Carr, R.N,"CARR" came into the unit and briefly spoke with CRAIGE (while periodically looking over in the direction of the plaintiff's cell, and making eye contact a few times), then turns around and leaves the unit without first checking on the plaintiff's medial condition. Plaintiff received no medical treatment or care at that time. Approximately four and half (4.5) to five hours had passed from the inception of this matter. This incident, in it's entirety, was interred into plaintiff's personal log, and followed-up with both a signed and sworn Declaration of the account (signed and sworn by; plaintiff,witnesses: Mike Cisnero-SID#16914237, Mike McKay-SID#833097, and Kevin Grant Bay-SID#06289155), and a formal grievance was filed regarding to the blatant deliberate indifference that was exerted (therewith, subsequent 'level-1' and level-2' grievance appeals).

CIVIL RIGHTS COMPLAINT (§1983)                                                      27

All stages and levels of the grievance process were concluded, thereby, exhausting all administrative remedies. (Too, Dr. Brown was later made aware of the matter, but too no avail.)

**70.** 07-26-2019, plaintiff submitted an ICF to Dr. Brown, regarding the matter of medical personnel (Aja Villarreal) being directed/ordered to relinquish plaintiff from his only means          of reasonable mobility (a 'Rollator'/or four-wheeled-walker), without first evaluating plaintiff's range of motion or his capacity of function-ability without it. This matter was further pursued by plaintiff the grievance process. All stages and levels of the grievance process were concluded,yet too no avail. thereby, exhausting all administrative remedies. (Too, Dr. Peng was informed of this matter through a medical ICF).

**71.**       07-27-2017, formal grievance (RE: Medical#CCIC_2017_08_002) was filed by the plaintiff, in regard to plaintiff not receiving; care, treatment, nor any type of medical attention after medical personnel had been notified that there was a medical issue. 4-5 hours latter a representative of Medical Health Services (Mrs. Nurse N. Carr, R.N.), arrives but shows no reverence toward plaintiff's condition, and simply tells the officer on duty ( CRAIGE) to relay the message that plaintiff, "fill out a' MURF' (medical request form". The grievance response from nurse Carr was dated 08-04-2017, and received by plaintiff on 09-07-2017. It erroneously stated that, "On 7/25/17 your (plaintiff's) issue was not new or emergent needing to be seen immediately." Erroneous, for the fact that she could not make any professional conclusion nor reasonable inference on the plaintiff's medical condition without first seeing him in person. Further, she shall not rally on any correctional officers opinions of the plaintiff's medical condition at that time, for the simple fact that Correctional officers are not qualified as medical professionals, thereby, can give no adequate medical advisement to medical professionals on the necessity or urgency of plaintiff's medical condition. The subsequent two (2) level of grievance

CIVIL RIGHTS COMPLAINT (§1983)                                              28

were exhausted, but too no avail, exhausting all required administrative remedies.

**72.**     07-27-2017, plaintiff submitted ICF to PENG regarding plaintiff's back-brace that had been misplaced at, or there after, the time of his initial intake process into the facility (C.C.I.C). The back-brace was taken by the intake officer, who intern said that it would be give to medical staff, and then returned after processing- but was never returned. There was never any attempt to return or replace plaintiff's missing back-brace. The only response received by the plaintiff was a written statement from PENG claiming that "medical" nor 'security" had no record of plaintiff being authorized said back-brace.

**73.** 06-05-2017, plaintiff was issued and authorized to have both a restriction to only a bottom-buck, and a back-brace by Dr. Angelina Platas, MD (a "Flex Support" made by Compression Garments). Electronically signed and dated by Dr. Platas on 06-05-2017 (at M.C.D.C). On the day of plaintiff's transfer from M.C.D.C to C.C.I.C (on or about 07-11-2017), shortly after arrival to C.C.I.C plaintiff was in attendance in the medical intake office with the intake nurse (john Doe) as he called M.C.D.C numerous times and requested that the plaintiff's medical records be faxed over. Plaintiff sat in the medical intake office until the fax were finally received, and the records gone over with the nurse. Thereby, it is erroneous that medical has no record of plaintiff's authorization of a lower-bunk assignment, or a back-brace.

**74.**     07-30-2017, plaintiff's submitted a ICF to medical in regarding his only adequate means of mobility ( a four-wheeled-walker) being taken away without just cause, nor proper warning. On 07-31-2017 the issued walker was taken. The walker was replaced with walking cane, which was the cause of further pain, strain and hindrance to the plaintiff. Too, plaintiff gave voice to medical the presence of concern for his precarious safety while unstably using the issued cane, but those concerns were not heeded- ICF sent 08-04-2017.

CIVIL RIGHTS COMPLAINT (§1983)                                          29

**75.**     08-04-2017, plaintiff submitted ICF to PENG regarding the fact that the prescription for

his pain-medication (Neurontin/ Gabapentin) was about expire on 08-09-2017,and requesting

that it be renewed. The response to plaintiff's ICF was answered on 08-07-2017, stating there

will be a "chart review". Without notice, nor just cause, O.D.O.C/Medical Health Services

allowed plaintiff's much needed medication to expire- regardless plaintiff's request for renewal.

**76.**     08-07-2017, erroneous accounts were found to have been made be one nurse Aja

Villarreal, RN (personnel of C.C.I.C Medical Heath Services). Following plaintiff's request for

copies of his medial records, he found that untruths had been logged into Ms. Villarreal's

progress notes on 07-21-2017. Which has subsequently become a part of plaintiff's permanent

medical record, thereby potentially adversely compromising plaintiff's credibility in the eyes of

other and or authoritative Medical Health Services personnel. Further, compromising plaintiff's

rightful access an adequate level of care and medical treatment. This incident of defamation and

slander to plaintiff's character was further pursued by plaintiff through his submission of  formal

grievance on the matter. But too no avail.

**77.**     08-07-2017, grievance #CCIC_2017_08_007, was filed in regard to Ms. Aja Villarreal's

false claims logged on 07-2102017. Grievance summery : plaintiff challenges nurse Villarreal's

assertions that plaintiff had been observed by unit officer (Jane/John Doe#4) "per unit officer,

Pt. (plaintiff) has been walking in the unit without walker and without issue". Further, he

challenges that whomever made the accusation be named and held accountable, and that the

video of the unit from the day(s) in question be preserved, so that the false allegations be proven

or dis-proven. To plaintiff's awareness, none of his challenges were ever met. The sol um

response came signed by a Mr. Dave Brown, and received by S.R.C.I grievance processing on

on Sep. 25th 2017 (subsequently cc. To plaintiff). The response stated, "Your chart notes indicate

CIVIL RIGHTS COMPLAINT (§1983)                                             30

info. received. This was a subjective observation and not a notation against your character. If have concerns w/the report from security please please address that w/security. Your record indicates that you still have your walker at this time.". Evasion from the matter at hand : that their medical personnel logged erroneous hearsay into plaintiff's medical records, and the issue was never rectified. The required grievance appeals (levels-1&2) were pursued, too no avail, and all other required administrative remedies were exhausted.

78.        007-2017; grievance #CCIC_2017_08_006 was filed. Grievance summery : plaintiff provides overview of : the precarious condition of his back injury(s), how injury occurred, the immediate events follow of the ongoing and continuous occurrences of receiving, at the most, pro-forma care and inadequate medical treatment (if not too, medical malpractice) throughout the duration of his malignant condition, the unreasonable amount of prolonged time passed before situations were properly addressed, other issues negated without professional rational or reasoning, O.D.O.C/medical's lack of proper policy and procedures, callous and deliberate indifference shown by medical personnel, etc. Plaintiff's grievance was denied, and returned back to him, therewith, a statement concluding that, "you (plaintiff) cannot appeal a denied grievance". In that instance, plaintiff exhausted all administrative remedies in the matter.

79.        08-08-2017, plaintiff was treated with deliberate in difference by a nurse J. Gillmore-Angles ("Mrs. ANGLES"), RN. Mrs. ANGLES wantonly denied plaintiff a proper means of mobility/ transportation (walker) without just cause or professional rational as to why, which had already been previously issued to him by doctor order. This deprivation of plaintiff's only means of mobility caused him further physical pain and strain, in addition to hindrance of his function-ability and potential determent to plaintiff's already precarious medical condition-furthering the damage to his back 's condition. Well knowing plaintiff was suffering from a

serious back injury, and was also suffering from the forced use of walking with a cane (while pressing and causing further injury/abuse to his pinched-nerve/ bulging-disc each time a step was taken), Mrs. ANGLES forced plaintiff to continue using the cane, after she had been noticed that it was causing plaintiff more difficulty and harm than benefit. Mrs ANGLES had also been informed by plaintiff's that he had previously been authorized to re-obtain the use of the walker in the case the cane was too much for him. Mrs. ANGLES' statements to the plaintiff included; "well..what do'ya want me to do about it? You already got everything you're gonna get." (emphasis omitted), and, "well, what can I say?.. If you don't use what we give'ya the first time we give it to ya, you lose it... so I'm not giving you another walker." (emphasis omitted).

**80.**      08-08-2017, Physical Plant workers finally came to fix the hand-rail that was reported by plaintiff to be loose- rickety and unsafe in cell# 104, unit-O, at C.C.I.C. A "work order" for both the hand-rails in cells 104 and 105 were submitted by officer Robeless on or about the evening of 07-25-2017,  who stated to plaintiff that, "I'll take care of it." Cell# 105, in which plaintiff sustained injuries from the fall, was never fixed following it's failure and malfunction- during plaintiff's tenure at C.C.I.C. Thereby, suggesting that the hand-rails in inmate cells at C.C.I.C are poorly maintained.

**81.**      08-09-2017, the renewal of plaintiff's pain medication was yet to be provided, which subsequently caused him to submit a second ICF regarding the issue. By 08-14-207, the date which this IFC received a response, plaintiff's Chart Review was yet too commence. Plaintiff continued to endure pain and suffering without pain-management medication (that reportedly worked for him) until after his back surgery. A time span well over 10-months. From August 9th 2017-to-June 22nd 2018, (This pain medication was never renewed, re-prescribed, and all of plaintiff's inquiries evaded when questioned as to why).

**82.**        08-10-2017, plaintiff's submitted ICF (at S.R.C.I) addressed to Nurse Nickleson, as

suggested by officer Johnny Auw, requesting that he be be provided a "live-in-helper".

Response to this request was returned and signed by nurse Nickleson on 08-18-2017 redirecting

plaintiff to address the matter with Nurse Wick. Plaintiff submitted said ICF to nurse Wick, as

directed by nurse Nickleson. Plaintiff never received a reply from nurse Wick, nor was plaintiff

ever provide a "live-in-helper". (fellow inmates of less need have been provided live-in-

helpers.)

**83.**        08-14-2017, plaintiff submitted  grievance# CCIC_2017_08_020 in regard to the matter

of the hand-rail(s) failure, the fact that there had been no regular maintenance of them, and lack

of policy/protocol  or operational procedure to insure routine inspections of every hand-rail in

the facility(s), etc. Plaintiff's grievance was accepted, and the response came dated and signed

by S. Walborn (and supervisor) on 09-08-2017 erroneously stating that: no repair request had

been put in, the cells are inspected for damage after occupants are moved out of them, and that

if something were found to deem repair a work request would have been placed in the system. A

blatant denial and negation of the facts, and evident omittance of any reply to plaintiff's qualms

with policy and procedure. Both levels-1 and level-2 grievance were filed, but too no avail,

subsequently exhausting all administrative remedies.

**84.**        08-16-2017, plaintiff submitted a ICF addressed to M.S.M "Medical Services Manager"

M. Landaverde and the T.L.C " Therapeutic Level of Care" Committee regarding the fact that

he had gone without his pain-medication (Neurontin/Gabapentin) for over a week with no one

from Medical Health Services able or willing to provide any definitive reasoning as to why ( 8-

16-17, plaintiff also spoke with both nurse Flores and Nurse Saito (Mr.) regarding the matter,

but nothing became of those inquiries after plaint was assured they would "look into it.).

CIVIL RIGHTS COMPLAINT (§1983)                                        33

Plaintiff's ICF was answered on 08-21-2017, with on relevant response toward his queries to the cause of his pain-medication being discontinued-and or- not renewed. Through the course of plaintiff's inquiries- and continuing- he was without proper pain-manage medication that worked for him, and is in a constant state of pain and suffering. Too, plaintiff's state of pain and suffering had been exacerbated due to the fact that he had recently arrived on the transport bus to S.R.C.I after a very painfully and approximate 7-8hour commute in the same restrained position on very stiff  and unrelenting seats from C.C.I.C.

85.    08-18-2019 (morning), plaintiff spoke with officer Mouder (barber shop coordinator at the time) regarding his and the plaintiff's mutual desire to have the plaintiff back working in the barber shop. But as officer Mouder regretfully expressed to the plaintiff, he was not at liberty to hire him at the time due to his current back injury/ medical condition. Regardless the fact that officer Mouder was in great need of both a Barber and Braider- as plaintiff's is well known to be exultant at both positions, plaintiff's was passed over, missing out on a job opportunity offering him about $82.00 a month (which is a lot, in contrast with the average jobs where he was housed at S.R.C.I paying ruffly $26.00 a month), causing the plaintiff further stress, emotional pain, and financial strain.

86.    08-20-2017, Officer B. Willis stopped plaintiff while coming out of the chow-hall because he stated to plaintiff that he noticed the evident "visual" pain the plaintiff seemed to be in. Officer Willis asked if he was O.K.- if he was sure, and gave him some advice on how he might possibly better receive reverence and rectification from O.D.O.C/ medical for his serious medical needs and precarious condition of his back.

87.    08-24-2017, plaintiff was denied reasonable request for access to mobility/ wheel chair to retrieve personal property from the " Property Room". The Property room was approximately

over 400-yards away from plaintiff's housing unit (3E/15B). Plaintiff's scheduled appointment was subsequently canceled and re-scheduled. Thus, he was forced to go without some of his much needed property until a later date.

88.    Plaintiff sent to both Dr. Joe DaFoe "Dr. DA'FOE" and Superintendent Braid Cain "CAIN" a carbon-copy ICF addressing the matter of being denied adequate medical treatment for his back injury which were evident, and causing a serious medical need. Too, an attachment (a sworn declaration, of verification of the facts) signed and dated by both inmate Fredrick T. Myles- sid#8970537 (plaintiff's cellmate), and the plaintiff were sent therewith. ("CAIN's" reply was received be plaintiff signed by a S. Mecham)

89.    8-24-2017, plaintiff submitted an ICF to Mrs. Jennings- his B.H.S (mental health) Counselor regarding the many adverse effects his back-condition and the lack of adequate treatment were having on him psychologically, emotionally, mentally.

90.    08-29-2019, plaintiff submitted second ICF to Mr. James Taylor (grievance coordinator) regarding the medical condition of his back, the subsequent grievance he filed, and the unanswered ICF sent to Mr. Taylor regarding this matter. Plaintiff's  first IFC was never answered by Mr. Taylor or returned to the plaintiff, nor was any correspondence sent to plaintiff addressing his desire of conducive reconciliation and rectification.

91.    08-30-2019, plaintiff was subjected to the cruel and unusual punishment of an unnecessary and arbitrary anal cavity examination by Dr. Lisa Koltes. Plaintiff relented to KOLTES' persistence that the examination was necessary to rule out the possibility of an ailment that would necessitate emergency surgery. At the time (as now) the plaintiff had the feeling that this examination was not truly necessary nor was it in any way directly related to the cause of his medical condition, of the symptoms asserted. Plaintiff reluctantly conceded to

the exam, due to his lack of medical knowledge, KOLTES' persistence of the examination's extreme importance, the fear that he would again be wrongfully accused of "not being cooperative", and the state of fear and apprehension caused be the said prospect that without the exam he may be in great danger and in need of emergency surgery. At the conclusion of plaintiff's exam/ appointment, he again stated his discomfort with the way the examination went, and in overview, the totality of the doctor's appointment. Dr. Koltes' response to the plaintiff's expressed feelings was to rebut that, "You're not a doctor , so you don't know what's best...and you wouldn't have too worry about it if you weren't such a Hypochondriac." (paraphrased, but using Dr. Koltes' language)

92.    08-31-2019, plaintiff was expressly denied when he requested that he be allowed the be seen by a specialist, or someone with a greater professional knowledge of back injuries and nerve damage. This denial came outright, and without second thought. No consideration on her behalf to even first confer with a higher authority (e.g. the T.L.C Committee/GULICK/medical administration/etc.). Koltes then attempted to rationalize her decision by stating that she, "cannot believe" plaintiff's symptoms claimed because, "maps don't lie. And the human body is a map." Plaintiff was then asked by KOLTES, "how can we believe you if what you tell us doesn't match-up to what we know as FACT, and truth of rules for our map..?"

93.    On or about 09-31-2019, plaintiff was wrongfully punished for continuing to be adamant the precarious state of his back's condition. Plaintiff was forced into the facilities infirmary after his visit with KOLTES, and under duress, forced to stay and go through premature "rehabilitation" (before his back injury was ever addressed). After explaining that it hurt and he could feel a nerve pinch in his lower back every time he took a step, plaintiff was still forced to walk the length of parallel-bars numerous times before he would (as stated by Nurse Greenwall)

even be considered a candidate to be discharged from the infirmary. Plaintiff was told by Nurse

Greenwall (and other infirmary personnel that would remain in the infirmary until his condition

bettered, or he would remain in the infirmary indefinitely. Plaintiff was forced to stay for

approximately 2-weeks, but after it was evident that he was going to give-up his claims to an

extreme medical need, he was released to "G.P." (general population).

94.     09-01-2017, plaintiff was subjected to further deliberate indifference by KOLTES when

she came to see him in the infirmary.  She accused plaintiff of, "(you're) not telling the truth"

about there being any pain or feeling a nerve pinch when he stepped down on (your) left foot,

because if there was, than you would be dragging your left leg behind you instead of being able

to apply any pressure on it- while using the walker. KOLTES went on to threaten plaintiff with

punishment, by stating to him that if he didn't. "miraculously get better within the next few

days," he would be forced to spend the remainder of his sentence in the infirmary. When

plaintiff again mentioned the potential benefits of him seeing a back-specialist, he was met with

a sardonic and indifferent response from KOLTES. She stated to the plaintiff that, "visits with

specialists are very expensive. We don't allow inmates that luxury without definitive reasoning

to the nature of injury, and justifying the necessity (of a visit with specialist) to the T.L.C

(committee). So, until then...you'll be here (referring to the infirmary). Concluding the meting,

KOLTES went on to state, "what it seems to me is: like many people, you have a syndrome that

causes your mind to think you're in pain, and something is wrong with you. When really, there

is nothing wrong with you at all."

95.     09-05-2017, KOLTES ordered Nurse Greenwall "RN GREENWALL" to force plaintiff

to walk while using the parallel-bars (but with the objective being to walk while putting

pressure on the left leg/nerve, and without using the bars), causing him Horrendous pain- to the

point he was sweating- and potentially causing further damage the nerve/ injury, and or, exacerbating plaintiff's precarious condition. (Repetitive compression no a nerve will more than likely causes further complications in one's condition, and potentially caused permanent damage to the nerve, a fact all licensed physicians should reasonably understand. Which is not objective in aid and healing of the nerve.). Before, during, and after the "rehabilitation session", plaintiff adamantly expressed his concern that his the directed course of treatment would course more harm than benefit, for the fact that there had been nothing done yet to first fix the injury. So logically, any means of rehabilitation at that time would be futile. The plaintiff had stated to KOLTES numerous times that he felt her course of ordered treatment was erroneous, and "like trying to rehab' a broken arm that has yet too be re-set or placed in a cast." (which in essences does not even come close to capturing the true severity of these circumstances, because perpetual damage to the spine can cause far greater complications to the quality of of one's life, than can living with improperly mended bone in one's arm.). Nurse Greenwall stated to plaintiff that "this (use of parallel-bars) should make it better" and "it's not my call, this is what the doctor wants." Plaintiff was coerced into complying by the promise of Nurse Greenwall that he would be discharged from the infirmary if just do as ordered. If not, the alternative would result in an indefinite infirmary stay. Nurse Greenwall (Mr.) again pressed the point that it was not his call, and the only other other option he had was too "take it-up with the doctor (at whatever time she happened returned). She decides who goes and who stays.". Plaintiff finally relented, but not without quandary and feeling a sense of peril, and orally asserting his disapproval.

96.    09-05-2017, plaintiff had a physical examination by KOLTES (arbitrary in nature, and as futile as prior examinations- the same tests over-and-over. KOLTES went over with plaintiff

her reasoning for "not (being) able to believe" his claims of injury as true. She stated, "you have total function with one test, then you have no function with the other." Plaintiff became vexed by KOLTES' air, and pretentious and complacent disposition, was well as her indifference to the genuine pain he was in and what he hat too say.

09-05-2017, Due to the said lack of belief fore plaintiff's claims of a serious medical need and assumed speculation of him malingering, KOLTES instructed nurse Greenwall to preform a "mini-Psych" test (which is a psychological examination that should have been administered by a licensed and trained psychologist, to determine the level of a patient's competency. Which RN GREENWALL is not qualified as, or to do.). Mr. Greenwall informed plaintiff that he had been directed to administer the test to gauge if the plaintiff was "going through early stages of dementia." Plaintiff felt appalled and disrespected, not too mention the despondent sense that adequate care would never be provided for his serious medical needs (caused by the said 'unbelief' of KOLTES/GULICK to plaintiff's injury, and unreasonably founded I might add). Too, plaintiff's felt it was foolish and demeaning to even entertain such an ordered requirement -- and voiced such to RN GREENWALL. RN GREENWALL concurred with the plaintiff's sentiments, by stating, " I know, I'm with you on this one. I don't see any real reason to be giving you this test... But that's the doctor's orders..." Plaintiff gave a sardonicly oral obliged, too simply appease KOLTES' demands. (plaintiff passed the test with flying colors, he does not have dementia)

**97.**      09-07-2017, After well over a year of plaintiff requesting to be seen by a back-specialist, he was provided an appointment with Physical Therapist Mr. Stevens "PT-STEVENS". PT-STEVENS affirmed plaintiff's long standing feeling that he presented with evident signs of " damage in both vertebra and nerve well, as far as I can tell without further imagery" (as stated by PT-STEVENS, statement made in reference to plaintiff receiving an M.R.I -and or- C.T.

CIVIL RIGHTS COMPLAINT (§1983)                                      39

Scan, as he had been requested for over a year). PT-STEVENS went on to state to the plaintiff that he would put in a request that if his symptoms persisted (for any longer than two weeks), he would need to have an M.R.I and be seen by a specialist in spinal injuries and reconstructive orthopedic surgery.

98.      09-17-2017, upon entering S.R.C.I Complex-2 "chow-hall" (supper time), plaintiff was stopped by officer D. Pittman, an officer who had been well familiarized with plaintiff prior to back injury. Officer Pittman stated that he was shocked to see that plaintiff had lost so much wait, and asked if he was alright. Mr. Pittman queried further by asking the cause of plaintiff's wait-loss, and current condition (plaintiff was using a wheelchair at the time). Plaintiff gave Mr. Pittman a quick summery of the occurrences in his life (in regard to his back-injury, and seeking adequate care therefore) over the past year. Mr. Pittman expressed sincere lament, and suggested that plaintiff should "stay on it" and "push hard" to receive reverence and rectification for his precarious condition. Mr. Pittman went as far as too suggest that plaintiff seek treatment through the "Bank & Spinal Institute" and-or "Advantage" (companies specializing in treatment for back related injuries), that have been doing "small laze incisions" as an alternative for conventional spinal surgery. Mr. Pittman stated that result had been said to be working very well for most people, and the recovery time is usually quick. (at the time of this exchange plaintiff's cell-mate Robert Stewart (SID#15620963) was pushing his wheelchair, and present the entire time)

99. 09-26-2017, plaintiff submitted ICF addressed to both GULICK and KOLTES. It was in regard to GULICK's and PT STEVENS' request that plaintiff contact them after doing the exercises prescribed by PT STEVENS for two weeks- in the event that the exercises did not help, and their planned course of treatment thereafter. As directed, plaintiff explained in the ICF that the

exercises were not helping but only causing him more pain, and worsening his condition. Though the initial ICF submitted regarding this matter received no response nor was returned to plaintiff, at the time of this second submitted ICF it had been almost three week since the exercises were first prescribed. The second ICF's reply came to plaintiff on 0/29/17, stating, "you do have an appointment coming up sooner Oct.".

100.    09-28-2017, plaintiff's only means of transportation and mobility was taken, without any prior notice. After being called to the Central Medical center, Nurse Saito "RN SAITO" was the one instructed by GULICK -an or - KOLTES to re-leave plaintiff of his prescribed, but now discontinued, walker. RN SAITO informed plaintiff that it was " per-doctor's orders" that the walker be discontinued and repossessed, and he did not have the authority to over-ride a doctor's orders (RN SAITO chose not to respond when plaintiff asked which doctor's order (GULICK/KOLTES) he was following. After some back-and-forth over plaintiff's need for the walker, as a consolation, RN SAITO's only resolution was that plaintiff's walker be replaced with crutches. Plaintiff then voiced his concern about ability/difficulty and lack of confidence in his stability while using the crutches- but too no avail.

101.    At the time of this repossession, it was well known by medical personnel -and well documented throughout plaintiff's medical records- that plaintiff's condition has been a continuous occurrence, and there was more than likely a pinched nerve in plaintiff's back. Further, it was evident through P.T. STEVENS findings that there was damage to either -or-both plaintiff's spinal cord, or nerves... Not only was the plaintiff forced to use in a manner that caused him great pain, and possible further damage, but was then subjected to additional pains and hardships by being forced to use crutches while enduring a serious back injury ( at times, for distances well over the length of multiply football fields). Thus, adversely causing

unnecessary and wanton damage.

**102.**    09-29-2017, plaintiff spoke with Sgt. Brown outside the chow-hall on complex-2 before breakfast. Plaintiff sought her assistance in helping him too obtain a temporary wheelchair to enable him to make it to his mental health/B.H.S "call-out" to meet with his counselor (Mrs. Jennings) for their monthly appointment- be that B.H.S (Behavioral Health Services) was Very far away from where plaintiff was housed. Plaintiff was instructed by Sgt. Brown to go and eat breakfast while she would "make a few calls and look into it". Upon exiting the chow-hall plaintiff was summoned over by Sgt. Brown, where she informed him that her attempt at aid didn't go as planned. She informed plaintiff that her call to medical was negated, then stated to plaintiff that, "they told me that I am not allowed to help you". She then relayed to plaintiff that she had been directed to tell him to "fill out a M.U.R.F" (Medical Request Form-see too as-ICF). Sgt. Brown then suggested that plaintiff ask his unit officer to call and just have is mental appointment canceled, so he wouldn't get into trouble for not showing. Either that, or suffer the pain of the laborious journey to B.H.S... Under duress, plaintiff opt to cancel his much needed appointment (especially given the circumstances), which was rescheduled to a later date.

**103.**    09-29-2017, plaintiff submitted an ICF addressed to M.S.M (Medical Services Manager) A. Hughes, in regard to the additional daily physical pain and hardships he was enduring ever since the erroneous repossession of his walker (among a number of things). Plaintiff requested that a walker or wheelchair be re-prescribed. The ICF was intercepted by John/Jane Doe, and sent back to plaintiff's with an adverse response that, "chart review with Dr. Gulick is scheduled".

**104.**    10-01-2017, plaintiff was stopped outside the complex-2 chow-hall by Lieutenant J. Beaumont, because as he stated, "I can see the pain on your face (from struggling while trying

CIVIL RIGHTS COMPLAINT (§1983)                                          42

to walk using the crutches), and you seem too be moving with extreme difficulty. Do you need a wheelchair, and wheelchair pusher?" Plaintiff then stated to Lt. Beaumont that indeed, he was in serious need of mobile-assistance, and then quickly and concisely depicted the course of him receiving inadequate medical treatment up until that point (listing everything pertaining to plaintiff's ongoing and diminishing back-injury; Medical Health Services lack of reverence to the matter, and the perpetuation of his precarious condition by such. Lt. Beaumont stated to plaintiff that, "rules prohibit me from intervening with medical decisions.", otherwise he would help. He then  suggested that plaintiff continue too remain diligent in obtaining reverence and remedy fore his condition.

105.    10-03-2017, plaintiff was stopped in the corridor headed to chow by Lt. Paynter, while on his way to breakfast. Lt. Paynter inquired after the standings of plaintiff's quest toward adequate medical treatment  for his serious medical needs. Plaintiff quickly and concisely explained. Lt. Paynter explained that he had learned of plaintiff's "unstable condition" from Lt. Ponce the day prior (10-02-2017), and would again re-adjourn and confer upon the matter with him at greater lengths. As Lt. Paynter stated to plaintiff's, this was to see what possible course(s) of action may have been taken to better aid the plaintiff toward medical remedy for his unstable condition.

106.    10-05-2017, plaintiff was seen by GULICK, who stated to plaintiff that it was no longer necessary for him to be seen by Physical Therapist STEVENS since his prescribed exercises were not working. GULICK then stated to plaintiff that it would be more objective for him too be seen by a chiropractor, "...but that'll never happen. Because it's much too expensive, and my boss would never be willing to pay for it...but...you could always pay for it out of (your own) pocket" (emphasis omitted). GULICK then explained to plaintiff that," the only other

alternative is an epidural-injection. But I don't think you're ready for that just yet...your symptoms don't really show signs that it would benefit you at this point.

**107.**      In regard to prescribing plaintiff pain-management medication, GULICK then stated to plaintiff, "...with what we can't tell from your symptoms, I can't reasonably justify giving you any type of pain-meds or narcotics. My boss wouldn't allow it...now, in some special cases, I could get away with it...but not in yours." GULICK's consolation recommendation was to up plaintiff's dose of Cymbolta (a psychological/ mood stabilizer, sometimes prescribed as a "pain-blocker") (a med that plaintiff has repeatedly reported does not work for him). GULICK denied plaintiff request that his use of a walker be reinstated. The base of GULICK's logic was that, "if I were to give you anything other than the crutches, I'd have too stick you back in the infirmary...so you're gonna have to learn to function with the crutches, or back (to the infirmary) you go..."

**108.**      10-06-2017, plaintiff was called to the central medical center for an unscheduled visit. At this time plaintiff had no proper form of mobility or transportation- be that his walker had been repossessed an approximate week prior, and exchanged for the crutches.

**109.**      From the unit in witch plaintiff was housed, to the central medical center, is approximately 300-yards (600-yards round trip). Plaintiff surmised that the unscheduled call-out was to return the walker, which would be unnecessary given the fact it had already been returned. He expressed this to the unit officer on duty at the time, and that the redundancy of such a trip would do nothing more than cause him further pain and strain. Plaintiff requested that the officer call back medical to verify the call-out's necessity. His request was obliged while he stood watch, and the officer assured him that medical personnel did indeed need to see him, but could/would not provide a reason as to why.

CIVIL RIGHTS COMPLAINT (§1983)                                                    44

**110.**    Ultimately, this was not the case. Plaintiff was forced to precariously labor in pain to the medical center, and back, for no other reason than to be questioned about a walker that had been taken from him a week prior.

**111.**    After over a year-pus of persistent requests fore adequate medical treatment, and pleas that he be provided with an M.R.I (and after at least (3) three denials from the T.L.C Committee), plaintiff's M.R.I referral was finally approved by the T.L.C Committee on October 11th 2017 (over 17-months after his initial injury).

**112.**    10-24-2017, grievance No. SRCI_2017_10_094 was filed by plaintiff against GULICK- et al., regarding the matter of his only means of reasonable mobility being taken and discontinued without first evaluating plaintiff's capability of function with it. Plaintiff too challenged SRCI/ODOC/medical services' policy and procedures (or lack thereof) for dealing with such issues, but received no true reverence and in the end, too no avail. A Grievance Response form was received by plaintiff on 12-01-2017, but dated November 15th 2017, the response, in gist, was mere placation and deviation from the merits of the matter presented. The overview of the response is that it was plaintiff's use of the walker in an "unsafe manner", "using the walker as a glider" and in the manner of a skateboard" that caused the walker to be discontinued.  What the response referred to, is the fact that plaintiff's nerve would further pinch in his lower-back (L-5/S-1) every time he applied any amount of pressure down on his left foot, and would cause shooting pains/ pins-&-needles/weakness/etc. throughout his lower-extremities. So to abate the ongoing occurrences, plaintiff would place his left knee on the seated portion of the walker (in a stable manner), brace himself securely and firmly (with arms and shoulders locked, supporting most of his weight), then propel himself forward toward his desired destination. Be that plaintiff should have been prescribed a wheelchair long before this

CIVIL RIGHTS COMPLAINT (§1983)                                                      45

issue arouse, this manner of use with the walker was the safest, least painful, least damaging why in which the plaintiff could move about give the chosen equipment GULICK/medical was willing to provide.

**113.**        11-05-2017, grievance No. SRCI_2017_11_016 was filed by plaintiff against Officer Mc'Nitt- et al., in regard to the numerous occasions Mc'Nitt harassed and punished both plaintiff and his assigned helper (at the time) for "moving too slow" to and fro the chow-hall. Plaintiff's condition and lack of ability of normal mobility and function was well known to Mc'Nitt as well as the vast majority of his coworkers working both complex-2 and 3, by the simple fact that plaintiff had been been very vocal to many security officers as well as many officers of medical personnel about his precarious medical condition. On several occasions Mc'Nitt received verbally reprieve for his interference and attempts to wantonly force plaintiff to move quickly and in an unsafe manner which would evidently jeopardy his unstable condition. These reprieves were administered by Sgt. Whittley (additional reprieve and directives too allow plaintiff additional time to-and-fro meals was ordered by both Lt. Ponce and Lt. Paynter- but directives negated by both c/o Sheppard and C/o Mc'Nitt), the same Sargent that refused to sign off on any of the numerous Disciplinary Write-ups/"D.R.'s" Mc'Nitt submitted seeking formal punishment fore both plaintiff and his helper. To circumvent Sgt. Whittley's authority and reprieve, Mc'Nitt waited until Sgt. Whittley's day off (11-05-2017) to pursue exerting further harassment and punishment onto plaintiff and his helper. Plaintiff's grievances received no reverence and was denied. Thereby the denial, no subsequent levels of grievance appeals were required by the plaintiff, though lacking that knowledge at the time, a level-1 grievance was filed.[2]

---

2    Officer Mc'Nitt intentionally denied plaintiff's access to medical care, as well as intently interfered with plaintiff's treatment. See Gregg vs. Georgia, *Supra, at 182-183, 49 Led. 859, 96 S. Ct. 2909,* prescribed by the 8th Amendment.

**114.**     11-05-2017, grievance No. SRCI_2017_11_012 was filed by plaintiff against Officer

Sheppard- et al.,  in regard to Sheppard's ongoing and continual, and intentional interference of

plaintiff's prescribed treatment. On numerous occasions, Sheppard harassed and punished both

plaintiff and his assigned helper (at the time) for "moving too slow" to and fro the chow-hall.

Plaintiff's condition and lack of ability of normal mobility and function was well known to

Sheppard as well as the vast majority of his coworkers working both complex-2 and 3, by the

simple fact that plaintiff had been been very vocal to many security officers as well as many

officers of medical personnel about his precarious medical condition. On several occasions

Sheppard received verbally reprieve for his interference and attempts to wantonly force plaintiff

to move quickly and in an unsafe manner which would evidently jeopardy his unstable

condition. These reprieves were administered by Sgt. Whittley, the same Sargent that refused to

sign off on any of the numerous Disciplinary Write-ups/"D.R.'s" Sheppard submitted seeking

formal punishment fore both plaintiff and his helper. To circumvent Sgt. Whittley's authority

and reprieve, Sheppard waited until Sgt. (Mr.) Whittley's day off (11-05-2017) to pursue

exerting further harassment and punishment onto plaintiff and his helper. Plaintiff's grievances

received no reverence and was denied. Thereby the denial, no subsequent levels of grievance

were required by the plaintiff, though lacking that knowledge at the time, a level-1 grievance

was filed.[3]

**115.**     11-16-2017, plaintiff submitted an ICF addressed to GULICK, regarding the matter of

rectifying and resolving the erroneous and arbitrary punishment which had been placed upon

the plaintiff, for being physically incapable at the time of and conforming with the standard

amount of time allotted to inmates for meals (including time took too make it to-and-fro chow-

---

3   Officer Shepard intentionally denied plaintiff's access to medical care, as well as intently interfered with plaintiff's
    treatment. See Gregg vs. Georgia, *Supra, at 182-183, 49 Led. 859, 96 S. Ct. 2909,* prescribed by the 8th Amendment.

CIVIL RIGHTS COMPLAINT (§1983)                                                                           47

hall). This issue had been addressed prior by both Lt. Paynter and Lt. Ponce, who advocated on behalf of the plaintiff to allot him additional time. Be that it is said "security officers" only have limited authority in regard to medical issues, Lt. Paynter and Lt. Ponce advised plaintiff too contact medical requesting for additional time for meals. Plaintiff did as advised, but only too receive indifference from medical personnel. Plaintiff's inquire was met with a vague reply, which redirected him back to "speak with security".

116.    12-12-2017, plaintiff's M.R.I was conducted. The examination was executed by a Mr. John Gambino, and conducted at the IMAGING CENTER OF IDAHO in Caldwell Idaho. The test results of plaintiff's M.R.I concluded that there was a spinal disc bulging at the L4-L5 reign, which was causing crowding at the L5 nerve root. Severe bilateral stenosis at the L5-S1 was found, along with disc protrusion, and narrowing of the nerval canal (this was plaintiff surmised, pinched-nerve and herniated-disc, and had been expressing to medical (et al.) for well over a year, at this point. Too, this was as Physical Therapist Stevens found to be the likely issue months earlier.)

117.    12-15-2017, plaintiff was called in to see KOLTES at an unscheduled appointment. They conversed briefly on the findings of plaintiff's M.R.I. KOLTES stated to plaintiff that his results "are and should be of great concern." KOLTES then stated that she conveyed to the Deputy Medical Director (Dr. C. DiGiulio,M.D.) that it was "imperative" plaintiff see a neurologist forthwith, rather than wait any longer than he already had. KOLTES stated to plaintiff that she and DiGiulio had had a rather lengthy conversation earlier that same morning. KOLTES stated to plaintiff was skeptical toward her professional opinion of what the next course of action should be, and failed to acquiesce her recommendation of consultation with a neurologist. KOLTES stated to the plaintiff, "he (DiGiulio) advised me that a simple cortisone-shot would

be a much more reasonable option, and way less expensive." KOLTES then stated to plaintiff
that she too requested that his pain medication (CYMBALTA) be switched back ( to
GABAPENTON/NEURONTIN), due to the fact plaintiff had frequently reported the Cymbalta
did not work fore him. Dr. DiGiulio denied her request. KOLTES stated that the reasoning for
the denial was that, "O.D.O.C does not have to provide any pain-medication that an outside
Physician prescribes, and at this time we're (O.D.O.C) is moving away from (providing)
Neurontin....they (O.D.O.C) don't like prescribing it."

118.      01-28-2018, a second grievance (No. SRCI_2018_01_163) was filed by plaintiff against
officer (Mr.) Mc'Nitt- et al. This was in regard to Mc'Nitt's ongoing/continual and intentional
interference of plaintiff's prescribed treatment, by Mc'Nitt denying plaintiff all his morning
medications, including plaintiff's critical pain-medication. When plaintiff expressed to Mc'Nitt
the impassiveness of the pain-med to aid in his daily function, McNitt then stated, "that's none
of my concern. It's your responsibility to make it to med-line on time". Traditionally, Mc'Nitt
would tell inmates to "go eat" or "I didn't call your unit (for med-line) yet" if they they try to
get in med-line before eating, unless he tells them otherwise. but on this occasion, Mc'Nitt
failed to direct the plaintiff into med-line, or that it was close to the time the medication window
would be closing. When plaintiff exited the chow-hall, the med-window was closed, but the
"med-window-nurse" was still in the med-room, and McNitt still would not allow the plaintiff
to take his medications (plaintiff's helper at the time, (Muraya Nash SID#2154779 was present
all the while).

119.      01-31-2018, after plaintiff was punished for having a wheelchair on the yard, he
submitted a medical ICF addressed to KOLTES, requesting that he be issued his own personal
wheelchair so that he be provided his rightful liberty of attending outside recreation- without

harassment, discrimination, or fear of unjust punishment. Plaintiff was told by Sgt. Whittle to, "take it-up with medical." As where, with regard to the same matter, the ICF from medical returned to plaintiff directed him to take it up with Security- for, it was stated that the wheelchair being on the yard "is up to security" (adverse deviation). This issue was never resolved. For fear of punishment, plaintiff did not attend yard/ outside recreation until months later, once he was moved from complex-2, to complex-3.

**120.**    02-13-208, plaintiff submitted an ICF to medical stating that his pain-medication (CYMBALTA) was not working. Plaintiff was then scheduled to see the sick-call nurse about a week later. But as plaintiff recalls, nothing was to ever come of that medical visit with the sick-all nurse.

**121.**    02-26-2018, plaintiff was led out of his cell by officer F. Bunn to speak with B.H.S (Behavioral Health Services) personnel (Mrs. Marines/et al.). She had documents she wanted plaintiff to sign. When plaintiff inquired about what the documents were pertaining, she simply stated that they were "just a form saying you are receiving your medication from us". Plaintiff that he had never in the past been obligate to sign any such forms in the entire time he had been at S.R.C.I facility (5-6 yrs.). Mrs. Marines then attempted to reassure plaintiff be stating, "it's just a formality, all inmates have to sign these when they're prescribed new medications..." Knowing that this statement was erroneous, plaintiff stated to he that her statement was not true. Now very apprehensive, plaintiff read the entire form (while Mrs. Marines continued an attempt at distracting and appease plaintiff, by explaining why the signing of the form was necessary). Plaintiff experienced vexation after coming to find out that the form was none other than a release form absolving O.D.O.C of liability, in the case plaintiff might happen to die from one of the medication's many side effects, or the medication itself. Plaintiff refused to sign the form,

CIVIL RIGHTS COMPLAINT (§1983)                                    50

politely thanked her for her time, and apologized for any inconvenience that may of been

caused. After that day plaintiff evidently never took this medication again. Th medication is

called "LAMICTAL".

122.    04-04-2018 (nearly two months after last request for new pain-medication), plaintiff was

yet too receive any reverence for his numerous assertions of suffering in perpetual pain, and in

need of new pain medication, due to the fact his current "pain-med" (CYMBALTA) was not

working. Plaintiff's only option was to submit another medical ICF. Shortly after the submission

of this ICF, plaintiff received notice that he was scheduled to be seen by a medical provider.

Nothing became of this scheduled appointment. At most, the plaintiff's current dosage might

have been raised (CYMBALTA,the same pain-med reported by plaintiff not to have worked).

123.    04-16-2018, plaintiff meet with Dr. LITTLE at a pre-operative appointment scheduled

outside the O.D.O.C facility. At that time Dr. LITTLE explained the procedure plaintiff would

under-go. Dr. LITTLE then assured plaintiff that post-op, <u>he would be provided a "detailed</u>

<u>After Care Plan that would need to be followed to the letter to maximize (plaintiff's) chances of</u>

<u>a full recovery</u>". Dr. LITTLE also stated to plaintiff that if the first surgery so happen "not too

take", for whatever reason, or the disc re-herniated, then he would repeat the surgery a second

time. If the second surgery did not work, then he would need to fuse plaintiff's spine.

124.    04-09-2018, plaintiff meet with KOLTES for a brief Q&A about what was said at

plaintiff's 4/6/18 appointment with Dr. LITTLE. Plaintiff explained to her as best he could, in

layman's. Plaintiff's "pain medication (NORTRIPYLINE) was switched from a night-med to

morning-med. When asked how he liked the medication, plaintiff explained that he did not

particularly care for it, because it had no noticeable effect. Since the subject had arisen, plaintiff

queried further, by questioning KOLTES about the possibility of the medication being a

placebo. KOLTES assured him that it was not (though this did nothing to ease plaintiff's doubt).

**125.**    04-18-2018, plaintiff's back surgery was finally approved by O.D.O.C/ T.L.C Committee (nearly 2 yrs./ approximately 22 months after plaintiff initiated complaints of back injury). The surgery was set to commence June 21st 2018.

**126.**    05-22-2018, plaintiff submitted another medical ICF asserting that he was in great pain, and that his pain-medication was still not working (due to security risks at this time plaintiff was not aware of his scheduled surgery date). The response came shortly thereafter, stating that he was scheduled for a "chart review", and that his surgery would be soon.

**127.**    06-21-2018, plaintiff's back surgery was proceeded. The surgical procedure was: Left L-5/S-1 HEMILAMINECTOMY and MICRODISKECTOMY.[4] The surgery was without event, and resulted in no complication- as stated in Dr. Little's report. Plaintiff was hospitalized for two days for recovery and further observation, then discharged on 06-22-2018 (with explicit patient instructions on "post-op care"). A plethora of prescriptions and recommendations were ordered by the plaintiff's Neurosurgeon Dr. Kenneth Little "Dr. LITTLE", being (discharge orders/medications prescribed 6/22/18@3:15pm) :

- CYCLOBENZAPRINE (Flexeril)_10mg. Every 4hrs. (this was changed without surgeon or doctor authorization by O.D.O.C/S.R.C.I nurse on 6/25/18- signed and dated).

- HYDROCODONE (Narco)_10-325mg. every 4hrs. (this was changed without surgeon or doctor authorization by O.D.O.C/S.R.C.I nurse on or about 6/22/18 or 6/25/18 -signed and dated). Further, this med was only provided to the plaintiff, irregularly, 3-times a day (not four, as ordered by plaintiff's surgeon. The last dose of the day would be at either 7pm-or-9pm., first

---

4    A 2-inch incision was made in plaintiff's lower-back. The inferior portion of the L-5 disc was removed using a drill. The S-1 nerve root was pulled out of the way, portions of the herniated disc were cut away. Large portions of the disc herniation were reduced into the disc space, and removed using a grabber.

dose of the day would be at approximately 7am. Which would leave a 10-to-12 hour time frame plaintiff was forced to suffer without any pain management medication.)

- GABAPENTIN (Neurontin)_900mg. twice daily (this pain-medication which was reported to work well for plaintiff (prior to surgery), was never provided to plaintiff by O.D.O.C/medical personnel as ordered post-op by surgeon.

- LIDOCAINE (Lidomerm) 5% "place 1-patch onto the skin daily. Remove and discard patch within 12-hours or as directed by MO, starting fri. 6/22/2018, until Sun. 7/22/2018, print". (Be that the extreme level of pain plaintiff was suffering post-surgery, this Lidocaine patch would have been his saving grace (as it was during his time spent in the hospital, post-operative. On the contrary, plaintiff was forced to suffer for approximately 30-days (from 6/22/18-to7/22/18), in a significant amount of additional and unnecessary pain, which could and should have been avoided, by simply adhering to Dr. LITTLE's post-operative orders.

- Pt. Physical therapy ordered as part of rehabilitation.[5]

- Further orders for "Physical Medicine and Rehab" by Mrs. Amber Dysart, O.T. (Occupational Therapist), (a part branch of Dr. LITTLE's post-operative team):

    1."(patient) "Pt." needs assist to boost to stand from low surfaces";

    2."O.T. Recommends Pt. Have access to soak-aid";

    3."long handled shoe horn "

    4."elevated toilet seat w/arm rest or grab bar...when returned to facility"

    5."...may need a bag or basket tied to front (of walker) to allow Pt. To carry own water cup -or

---

5   Plaintiff consulted with P.T. Stevens once post-op. No physical therapy administered to Pt., leave the irregular use of the unstable and
poor functioning bi-pod peddled apparatus.

have assigned helper do so for Pt. As facility rules may dictate" (a helper was provided for plaintiff, though only to push his wheelchair and carry his food tray at meal times).[6]

129.    06-23-2018, plaintiff's dis charged from hospital. Pain med changed without first consulting surgeon, or evaluating plaintiff's condition.

130.    06-26-2018, plaintiff's submitted ICF to the "medical prescriber" to get his pain-med re-instated, be that he was informed at the med-window that his pain-medications would be discontinued on 6/28/18 -not even a week following his surgery and discharge from the hospital. Plaintiff's pain-meds were reissued for an additional 7-days.

131.    07-07-18, plaintiff submitted a ICF to medical asserting the new development that his "big toe on (his) left foot has been numb for about the past 3-to-4 days". Plaintiff was told it would be "addressed" later on that evening, when he arrived to to his scheduled call-out for his daily (incision site) dressing change. The issue was never addressed. When plaintiff broached the matter later that evening, the nurse stated that, "I have no idea what to tell you...sometimes weird things happen after surgery." plaintiff feels this response was not reasonable, nor an adequate form of treatment. Therefore, addition remedy was sought, though received no reverence from O.D.O.C/ medical personnel. Plaintiff continues suffer from lose of feeling in his big-toe.

132.    07-07-2018, plaintiff submitted an ICF to medical expressing some of the adverse effects he was experiencing from withdrawal from the narcotic ("NARCO") which had been prescribed him post-op. Plaintiff had been cut off the medication without winning, or "cold-turkey". This caused the plaintiff to experience; hot flashes/cold flashes, blurry vision,

---

6    Prison physician(s) refused to administer or provide necessary post-operative; assistance, medical devices, medications, as well as proper and adequate physical therapy. By that, and in essence, rendering plaintiff's back surgery moot, by requiring plaintiff to preform daily tasks directed by surgeon to avoid. Such as; putting on socks and shoes, making his bed, etc. (other tasks which necessitate bending-lifting-and twisting), despite contrary instructions from the Neurosurgeon too avoid what he calls "B.L.T" (bending-lifting-and twisting).

dizziness, "the shakes", nausea, etc. These symptoms, coupled with the residual pains from a

resent back surgery, caused plaintiff to endure and suffer in unbearable amount of pain, and an

ineffable state of precarious despondency.

133.        07-17-2018, plaintiff submitted an ICF to KOLTES inquiring about a number of things

ordered fore plaintiff by Dr. LITTLE, which had not been provided to him post-op. This ICF

stated that among may things, he had yet to be provided with; Gabapentin,  "live-in-helper",

"sock aid", or "long handled shoehorn". There was only one issue addressed, which was

through an erroneous statement claiming that she (KOLTES) spoke with Dr. LITTLE the day

plaintiff was discharged fro the hospital[7], and that he stated to her that "he would not prescribe

someone Gabapentin if we (O.D.O.C/medical) did not already have you (plaintiff) on it.

134.        07-17-2018,  plaintiff received a "Test Results Communication (form)" from KOLTES.

Written on it was a statement claiming that (in essence), Dr. LITTLE had prescribed the pain-

med GABAPENTIN/ NEUROTIN to the plaintiff, post-op, by accident. KOLTES went on too

state that she spoke with Dr. LITTLE (via, calling him after hours), and he assured her that he

would prescribe that particular medication  if the patient was not already on it prior to surgery.[8]

plaintiff was prescribed this medication post-operative, which is why Dr. LITTLE reordered it.

It is O.D.O.C/KOLTES/GULICK et al. Whom wished plaintiff not to be prescribed the the non-

narcotic medication (for reasons unknown to plaintiff).

135.        07-11-2018, Dr. LITTLE re-ordered and prescribed plaintiff the pain-medication

---

7  06-22-2018, plaintiff was discharged from the hospital, post-op.

8  Plaintiff's O.D.O.C medical records (pre-op) show that plaintiff had been prescribed the medication initially at
Multnomah County Detention Center Jail in 2017, throughout his intake process into O.D.O.C at Coffee Creek, and all
the way up until he was transported back to S.R.C.I, where he was then taken off the non-narcotic (reported by plaintiff
to work well for him, in contrast to other pain-meds provided, or available to him) by either or KOLTES/GULICK. This
was without prior notice to plaintiff, provocation, or without just cause.

(GABAPENTIN), for the second time, after Dr. LITTLE and plaintiff conferred about what plaintiff's recovery plan would look like. Plaintiff met with Dr. LITTLE in office at an outside (of S.R.C.I/O.D.O.C facility) scheduled appointment, for a routine post-operative evaluation. At this meeting plaintiff explained the situation of S.R.C.I medical personnel's (KOLTES/GULICK/TLC Committee) blatant denial of his prescribed medication (GABAPENTIN). On the contrary to the reasoning for denial given to plaintiff by KOLTES, Dr. LITTLE assured plaintiff that he did not see a problem with providing this medication for the plaintiff post-op, especially sense it is known to have worked well for the plaintiff in the past, and it is not classified as a narcotic. Given this professional opinion, Dr. LITTLE's conclusion at the end of their meeting was too re-write an order for plaintiff to be provided the GABAPENTIN. At the very least, plaintiff was to receive the pain-med for four weeks from the date of this visit ("Gabapentin 600mg.-Po-T1D-until f/u (with) me, f/u with me in ~ 4weeks -which is from 07/11/18-to-08-11-2018).[9] Once again plaintiff was, without adequate reasoning, denied the pain-medication once he returned back to S.R.C.I.

136.    07-20-2018, plaintiff submitted another ICF to medical regarding the blatant denial and lack of reverence in heeding plaintiff's neurosurgeon's order, and recommendations of what plaintiff's treatment plan should entail. Too, it addressed plaintiff's feeling that there was a gross amount of deliberate indifference to plaintiff's serious medical needs being exerted on the behalves of KOLTES, GULICK, and or the TLC Committee. And that they were knowingly and willing allowing plaintiff to suffer in unreasonable amount extreme and unnecessary pain (or, "a wanton infliction of pain").

137.    Defendant's (KOLTES/GULICK) response was too shift blame on the TLC Committee,

---

9  See Dr. Little's "Authorization Summary" and "Provider's returning Information" dated 07/11-2018.

stating, "TLC also denied Gabapentin, specialist's orders are only suggestions or recommendations, but do not necessitate O.D.O.C following."[10]

138.     08-08-2028, plaintiff submitted a ICF to medical asserting that he felt a 'pop' in his back one evening while struggling to take his socks off (without sock-aid, as was also recommended by surgeon Little's recovery/rehab team). This incident caused plaintiff to be in an extreme amount of pain the next morning, upon waking. This also caused plaintiff lose of a significant amount of not only physical function, but range of motion and overall mobility as well. The majority of recovery made by plaintiff sense his surgery, had all but entirely regressed back to his original level of in-capacity. When finally seen at "sick call" a few days later, plaintiff was told he had a " up-coming appointment with Dr. Little". No treatment was provided for plaintiff at that time.

139.     08-15-2018, plaintiff was again seen by Dr. LITTLE in his office, at an outside scheduled appointment. Plaintiff explained to Dr. LITTLE that medical personnel (O.D.O.C/ KOLTES/ GULICK/ TLC Committee) again denied, and without reason given, refused to provided him with the pain-medication prescribed by Dr. LITTLE on their last visit.

140.     08-15-2018, plaintiff was seen by Dr. LITTLE in his office, at a scheduled appointment. Plaintiff explained to Dr. LITTLE how O.D.O.C/Medical Services refused to provide the post-operative medications that he (Little) prescribed -for reasons unexplained to plaintiff at that time- ordered for plaintiff on there last visit, a month prior. At that time, Dr. LITTLE opt for another course of action, being: Therapeutic Back Therapy/ "Pressure-point-Therapy". Dr. LITTLE wrote an order for plaintiff to be allowed the use of a little blue racket/hand ball, to lie

---

10 This statement is contrary to what is said to have resulted in supporting a finding of deliberate indifference in *Martinez vs. Mancusi, 443 F.2d 921* ("...prison physician refused to administer the prescribed pain killer...despite instructions of surgeon."

on and apply pressure at different points along plaintiff's spine. Though these little blue balls are available to all inmates that using the gym at S.R.C.I, and sold to many other inmates throughout most other O.D.O.C facilities, plaintiff's was again denied this form of Physical Therapy prescribed by a back surgeon (plaintiff's). This order was denied by both KOLTES and the T.L.C Committee (with on reasoning as to why, given to plaintiff when he asked).

141.    At the same appointment enumerated above (in #140), plaintiff was too prescribed a muscle relaxer called "FLEXERIL" to help abate plaintiff's continuous muscle spasms ("10mg. Daily for the next 4-weeks, then D/C", from 08/15/2018-to-09/15/2018).  Again, this medication was not provided by O.D.O.C/ medical Services/ et al. The T.L.C Committee/ KOLTES/et al. refused to administer this much need medication to plaintiff, thereby adversely exacerbating the matter. It was well known to the defendants that plaintiff was experiencing  an extreme amount of physical pain and mental/ emotional stress. Be that what it may, defendants cognitively chose to exert deliberate indifference toward the plaintiff by wantonly allowing him to continue suffering, while taking no substantial steps toward providing an adequate level of care, in light of plaintiff's sever condition at that time.[11]

142.    08-20-2018, plaintiff submitted a ICF to KOLTES inquiring into the matter of his medication/ blue-ball which were not provided (as named in #41 & #43). Plaintiff wanted to know if KOLTES/ T.L.C planned on obliging Dr. LITTLE'S recommendations/ prescriptions/orders for the muscle relaxers, and the blue-ball for "pressure-point-therapy". Plaintiff was met with the familiar response of: "you've been scheduled for a chart review" (On 08/22/2018 The T.L.C Committee met and took under view Dr. Little's orders for plaintiff. They officially denied the Neurosurgeon's orders for both the muscle relaxer and the blue-ball (this

---

11 See: "Authorization Summary/ Provider's Returning Information" orders sent by Dr. Little  (with plaintiff) to medical services/Dr. Koltes/et al.

CIVIL RIGHTS COMPLAINT (§1983)                                                    58

was without just cause, or any cause otherwise stated). As a consolation to appease, The T.L.C

Committee opt to approve one (arbitrary) consultation with Mr. STEVENS, P.T (O.D.O.C/

S.R.C.I contracted Physical Therapist). Which ultimately resulted in no adequate treatment, just

talking (simply conversing over what plaintiff was already doing to aid in his recovery, and

reiteration of the symptoms giving rise to plaintiff's claims of issues, which were addressed with

Dr. LITTLE).

143.        09/26/2018, plaintiff submitted an ICF to medical. It stated that he had taken some time

since his last ICF to allow his body to heal, as directed by KOLTES. Though, it had been over

3-months since his back-surgery, and he was still feeling an unreasonable amount of pain and

residual effects, such as; nerve pinching in his back, continuous muscle spasms, and he had yet

too gain any feeling in his big toe on his left foot. Plaintiff than breached the topic of denial of

the blue-ball and muscle relaxer, and questioned the motives of the T.L.C Committee and

authority of substituting those order for a redundant and arbitrary one time consultation with

with Mr. Stevens (P.T.). Plaintiff than explained to KOLTES that he felt that decision was

unreasonable, in light that a perfectly fine treatment had already been formed by plaintiff's

neurosurgeon, Dr. LITTLE. For O.D.O.C/Medical Services/T.L.C Committee to blatantly

disregard the orders and recommendations of their longtime contracted back-specialist and

neurosurgeon, and without stated reason, demonstrates an evident ulterior non-medical motive

in denying plaintiff's surgeon's prescribed treatment. In the instance defendants were to rally on

the assertion that this decision was objective and medical based, plaintiff is entitled to know the

reasons for decisions made in regard to his medical condition -which plaintiff was never

provided when inquired. Again, the response returned to plaintiff was, "you've been scheduled

for a chart review".

144.     10-10-2018, plaintiff sent a letter to the "Vise President of Accreditation Services

Commission on Correctional Health Care" requesting to participate in a survey they were

holding at S.R.C.I, were inmates would be allowed to provide "comments regarding the health

services provided at this (S.R.C.i0 facilities." plaintiff was never allowed to participate, though

he submitted not one, but two letters to the Vice President[12] at: 1145 W. Diversey Pkwy.

Chicago, Il. 60614-1318, on 10/1018 and 10/14/18.

145.     10-10-2018, plaintiff submitted an ICF to The T.L.C Committee regarding the denial of

Dr. LITTLE's orders that plaintiff be provided hand-ball/muscle relaxer (which had also been

recommended by P.T. Stevens by that time). It also included plaintiff's assertions that he felt it

senseless to deny the order for the blue-ball, especially since inmates at other facilities

throughout O.D.O.C have liberal access to them, and in some facilities are even allowed to buy

them off commissary/canteen. No reply ever came from The T.L.C Committee, though

plaintiff's ICF was intercepted by KOLTES, who stated "you have an appt. w/me on 10/22/18.

TLC denied your request, but after I see you, I can present again @ T.L.C as needed. The bike

is recommended and we do not write (orders/prescriptions) for bike (use) in gym or for gym

(access)".

146.     10,22-2018, close to a month later, plaintiff was finally called in for a visit to speak with

KOLTES. Nothing of any great significant in regard to the condition of plaintiff's back was

discussed at that time. KOLTES chose to stick to the topic of plaintiff's Tonsillectomy, and

recovery thereof, he had underwent a few days prior. Be that plaintiff expressed extreme

suffering and excruciating pain from the double Tonsillectomy procedure[13] preformed, coupled

---

12 at: 1145 W. Diversey Pkwy. Chicago, Il. 60614-1318

13 Plaintiff's cauterized tonsil abscessed, then erupted, causing plaintiff to choke on the continuous on-slot of blood until he
was rushed to the hospital and a second procedure could be preformed, and the throat re-cauterized.

with the continuous pain from his back-injury, KOLTES acquiesced plaintiff's request for ice for consumption. But when the matter of plaintiff's back-issues/conditions were brought up by him, KOLTES refused to discuss the topic to any reasonable length -other than to ask plaintiff if he was doing the "physical therapy" exercises prescribed him (which was nothing more than what the plaintiff had already been doing prior to them being "prescribed" -stretches and pedaling the stationary bike in the gym, when able and allowed.).

147.    On that after noon of 10-22-2018, upon returning from his visit with KOLTES, plaintiff's housing officer Mrs. Shepard (unit 3-E/cell-11/bunk-B{bottom}) informed the plaintiff that he had to relinquish his extra mattress (which was ordered/prescribed to him by KOLTES too aid in his post-operative recovery). At no time during plaintiff's visit with KOLTES did she raise the issue of there being any discontinuing of this aid, but she did go over with him all renewals of other orders which were about too expire. KOLTES gave plaintiff no warning or inclination as to when or why this would happen. This is another display of O.D.O.C/ Medical Services wanton indifference to properly determine what the specific needs are for an individual inmate/patient so that adequate medical care and treatment may be provided. By KOLTES/Medical Services/ O.D.O.C/et al. Unreasonably withholding crucial instruments to aid and assist in the recovery of plaintiff, especially without first conferring with plaintiff -and or-evaluating his level of functionality, to gauge if it was reasonable or necessary to discontinue the prescribed mattress was in essence placing a deadline on the plaintiff's recovery. Allotting someone who has just undergone back-surgery a limited amount of time to recovery and heal is erroneous, and in contrast to the magnitude of this matter, was not providing the plaintiff adequate medical treatment.

148.    10-22-2018, plaintiff was sent to "D.S.U" (Disciplinary Segregation Unit) for an

medical unrelated circumstances. While there, plaintiff was obliged (infrequently)to use the "bike" (a 2-peddled,bi-pod apparatus) as his only means of physical therapy, Monday-Friday. Be that the bike was ill-functioning and often broken, it's subsequent use was rather sporadic. Regardless that fact, plaintiff ceased every opportunity afforded him to use the apparatus. Regardless the equipment's functionality at that time, or the level of pain and discomfort plaintiff might have been feeling that day, he would at least attempt to use the bike (even if just to get out of his cell). The one day plaintiff declined the use of the bike was on 11/12/2018, and this was because the fact of him being in too much pain to think straight or move -due to the combined effects of back-pain, a tonsillectomy, and denial of his pain-medication. But at times, this resource was often not available due to; the failure to place plaintiff's name on the call-out's, officers not going to get plaintiff, cancellation of plaintiff's call-out's without his knowledge, and or other medical/security issues through the facility unknown to plaintiff. In addition, plaintiff was diligent in his efforts to assert that he desired the bike's use -being his only means of "physical therapy" that was or ever has been provided by O.D.O.C/ medical/ et al.[14]

149.    11-13-2018, plaintiff submitted an ICF to KOLTES/GULICK seeking to re-obtain his discontinued mattress. It stated that while being in D.S.U, where all the mattress lie on a concrete-slab, was having adverse effects on his back-injury, and the condition thereof. He also asserted that his symptoms seemed too be worsening. As in; an increase in pain in his lower back, waking up from sleep -caused by a feeling of pins & needles and pressure in his lower-extremities, tingling and numbness in his legs and feet, and muscle spasms for extended periods

---

14 On 11/12/18 plaintiff submitted an ICF informing them that he had not been allowed to use, or called down to use the bike in over a week. On 11/15/18 that ICF was answered (which plaintiff received on 11/16/18). the ICF stated an apology for their on mixing-up the call-out schedules with the wrong complex. On 11/16/18 plaintiff back on the regular schedule, and allowed to use the bike. Yet and still, the bike remained broken and ill-functioning because of missing baring in the crank (which is what plaintiff's came to find out at a later date).

of time. All symptoms revolving around an evident nerve issue. Yet not heeded, and never

addressed (with objected action) by medical. GULICK's written response to this issue was

received by plaintiff on 11/15/18, which stated that "an extra mattress has no role in lower back

(treatment)", and the fact of plaintiff being found in violation of having contraband (shiv) found

in his mattress "makes it a bigger deal" for him (GULICK) being able to provide plaintiff with

the medical aid of an extra mattress (this was quite the contrary to what had been stated to

plaintiff after speaking with a Captain KYLE, regarding their (O.D.O.C) stance and policy on

affording inmates an extra mattress after they have been found to of had contraband in them.[15]

Further, if it were so, as GULICK so stated to plaintiff -to be a 'big deal', the plaintiff would

have been placed on "dry cell status" (which is where the inmate is allowed basically noting in

the cell -including; mattress, pillow, blanket, toilet paper, etc.) upon arriving in the assigned

segregation cell, and allowed no mattress at all. GULICK is the only authority to claim

plaintiff's infraction as a big enough deal, that it should warrant plaintiff's deprivation of a

needed medical resource. Thereby, GULICK's conclusion to consciously make the medical

decision -of not reordering the mattress, was not based on professional judgment, or derivative

of a medical opinion. Through exercising the less efficacious form of treatment -deliberately

disregarding plaintiff's claims -etc., and blatantly refusing to address the crux of plaintiff's

serious medical need(s) (continual nerve problems in  plaintiff's back, and the adverse effects

there of), shows that the level of care being provided for plaintiff was unprofessional and was

also based on *non*-medical elements.

150.        11-20-2018, Plaintiff was escorted by an officer to a scheduled appointment to be seen

---

15 Captain Kyle stated," security doesn't really have anything to do with what what the doctor prescribes, as far as an extra
mattress, or extra pillow, or what have you...that's on them (medical0. We (security) don't really care one way or the
other. I mean you already got caught and are serving you're time in seg. (segregation), right? (plaintiff affirmed) Well
O.K. then you've been punished, and if you happen to have an other shiv in you're mattress, well find it, and you'll be
right back down here in the "hole" (segregation).

by GULICK. This visit was in regard to ICF sent by plaintiff enumerating his post-operative complications. When plaintiff broached the topic of the discontinued mattress, GULICK averted the question all together, then rallied on blaming KOLTES for the circumstances. GULICK stated that, "some doctors have been going outside of protocol and procedure -that's why they're stopping inmates from having all sorts of stuff, like; mattress, pillows, braces, and a bunch of other stuff." GULICK then made an attempt at rationalizing that the plaintiff's overall condition (from conception) was "minor" in contrast to "other inmate's injuries", and that "you (plaintiff) don't have an serious medical condition, and never have..." When plaintiff attempted to explain that his back injuries -and subsequent surgery- were indeed serious, and serious enough to warrant back-surgery, GULICK stated " well yeah, but that was just a minor surgery." Further, when GULICK went as far to claim that plaintiff never had "anything severe. lick Spinal-Stenosis", plaintiff then became highly irritated and vexed. Plaintiff them assured GULICK that if he (GULICK) checked his "file" (medical record) it would show that on the contrary, he did indeed have both severe bilateral Stenosis and narrowing of the nerval-canal. At a literal lose of words, GULICK then paused -but quickly recovered, and stated "...yeah, but your Stenosis isn't that bad yet" (totally contradicting what he had just stated only moments prior). Plaintiff feeling as though no reverence for his concerns was being exerted GULICK, while being shutdown at every juncture (vexed and despondent), then leaned back in his wheelchair, looked up at the ceiling, and under his breath stated "Lord help me, this dudes' a clown..." GULICK then became highly agitated and irate, yelling that the plaintiff had "disrespected" him, and to the officer "THAT'S A 'D.R.' (disciplinary write-up), THAT'S A 'D.R! "[16] Plaintiff then politely asked the officer "can you please get me away from this clown, and out of his three ringed circus?" 9While plaintiff is in the wheelchair, his hands are cuffed in

16 At this time plaintiff remained completely composed, throughout Dr. Gulick's ranting-and-raving.

front of him and resting in his lap.) As officer Patino began pushing plaintiff out of the office, GULICK then stated to the plaintiff's back as he was wheeled out of the office, "oh yeah...I was gonna start a plan to address your stenosis, but since you call me a 'clown', now I'm not" (emphasis omitted). At this time, both officers Plioggio and his 'escorting partner' were present, as well as officer Patino. Plaintiff feels that this retaliatory action on behalf of GULICK is not only vindictive and unprofessional, but that this response is a blatant act sufficiently harmful to the plaintiff's serious medical condition, and evidences deliberate indifference. (" it being of such indifference that can offend evolving standards of decency in violation of the Eighth Amendment of the U.S. Constitution. *Estelle vs. Gamble*, 429 U.S. 97, 50 L Ed 2d. 251, 97 S. Ct. 285.)

151.     By both this act of GULICK (as stated above), and his lack of action (intentionally making the coherent chose to disregard plaintiff's spinal stenosis), shall be vied as repugnant to the conscience of mankind. By this response, GULICK has consciously and willingly exercised a gross and wanton infliction of pain onto the plaintiff, perpetuating his lack of adequate treatment. The character of this of punishment may well have, and most likely has caused further injury, additional medical complications, if not irreversible and permanent damage. Plaintiff's medical condition has been exacerbated to the point that corrective surgery will more than likely be required. It is evident that a great amount of residual harm has occurred, but only time can tell what these drastic effects might play in the future, in regard to the quality of life the plaintiff is able to live.[17]

152.     11-28-2018, plaintiff submitted an ICF addressed to Mrs. Colette S. Peters (Director of O.D.O.C) regarding GULICK's callous conduct while handling plaintiff's medical matters,

---

17 Though all administrative remedies had been exhausted prior to this incident, notice of tort filed, in the name of prudence, plaintiff submitted a formal grievance regarding this particular matter. See grievance #SRCI_2019_11_119, submitted 11/20/2018.

including those yet to be addressed. This ICF submitted detailed GULICK's apathetic stance toward most, if not all, of plaintiff's medical issues and concerns. The ICF enumerated the multitude of ongoing occurrences of hardships while seeking reverence and rectification of plaintiff's serious medical needs. This ICF was hand copied (twice) by the plaintiff and forwarded to Dr. DiGiulio[18] and Dr. Shelton (heads of Medical Health Services for O.D.O.C), but neither of them were ever returned to plaintiff. The initial ICF sent to Mrs. Colette S. Peters was erroneously forwarded to a Mr. Joe Bugher (for B. Greesbael) , of "H.S." (health Services).[19]

153.    Plaintiff also believes there may be sufficient evidence to reasonably state a subsection 1983 Conspiracy Claim. Plaintiff's allegations stated throughout this complaint  support the three prong test: 1) An agreement between two or more actors, or between a state actor and a private entity, which plaintiff substantiates through claim; 2)To act in concert to inflect an unconstitutional injury, which plaintiff substantiates through claims; and 3)An overt act done in furtherance of that goal causing damages. A subsection 1983 Conspiracy must be based on an underlying violation of one or more constitutional rights, which plaintiff substantiates through claims. In this matter, plaintiff asserts that he has met all three test standards, which has been substantiated through his many claims.

---

18  The kyte addressed to Dr. Shelton was redirected to Dr. DiGiulio. DiGiulio's reply was as appeasement and simply reiterate plaintiff's medical file, and his conclusion was too erroneously claim that the treatment provided to plaintiff is "consistent with community standards."

19  The kyte addressed to Mrs Colette S. peters (Head Director of O.D.O.C) was redirected to J. Bugher. J. Bugher's reply was placation with the attempt to appeasement, and simply stated that plaintiff's 'letter' had been received  and forwared to him for "response/ review". (no response has been received by plaintiff, nor is plaintiff aware of any 'review' that has commenced in regard to this matter.)

## VERIFICATION DECLARATION (ORCP RULE: 1E)

I, RICO CARLOS NEWMANN, do so declare that :

All facts alleged throughout this 42 U.S.C subsection 1983 Complaint are true and correct as best known to (me) the plaintiff.

"I HEREBY DECLARE THAT THE ABOVE STATEMENT

IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF,

AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE

IN COURT AND IS SUBJECTED TO PENALTY OF PURJURY".

DATED THIS 12ᵀᴴ DAY OF July , 20 19.

SIGNATURE :

NAME: Rico C. Newmann

SID# 12397798

ADDRESS: 777 Stanton, Blvd.

Ontario, Or

97914 -

CIVIL RIGHTS COMPLAINT (§1983)                    67

## CLAIMS FOR RELIEF

PLAINTIFF CLAIMS RELIEF FOR :

1. The refusal of defendant's Dr. Garth Gulick and Dr. Lisa Koltes to provide adequate medical care in a timely manner for the plaintiff, over an *unnecessary* extended period of time, after plaintiff had made it well known and evident to the defendants that he was needlessly suffering from a physical injury causing him *extreme* pain in his back and spine, thus creating a serious medical need, constitutes cruel and unusual punishment in violation of the Eight Amendment of the United States Constitution.

2. The failure and refusal of defendant(s) Dr. Lisa Koltes ( and or Dr. Garth Gulick) to provide plaintiff with Neurosurgeon ordered medications (and other medical provisions/resources to aid in plaintiff's recovery and Physical Therapy) for plaintiff's post-surgery recovery and treatment, clearly amounted to 'intentional interfering with the treatment once prescribed to the prisoner' which the U.S. Supreme Court has specifically cited in *Estelle* v. *Gamble* as an example of unconstitutional deliberate indifference to prisoner's medical needs, and in this case also constitutes cruel and unusual punishment in violation of the Eight Amendment of the United States Constitution.

3. The retaliatory actions (or lack thereof) and reasoning of Dr. Garth Gulick for cognitively choosing not to provide the necessary treatment needed for plaintiff's Spinal Stenosis is an example of unconstitutional deliberate indifference to prisoner's medical needs, and in this case constitutes cruel and unusual punishment in violation of the Eight Amendment of the United States Constitution.

4. The action of Dr. Lisa Koltes erroneously choosing assert the necessity , and preforming an

CIVIL RIGHTS COMPLAINT (§1983)                                                    82

arbitrary rectal examination against plaintiff's will, when plaintiff's only complaint had been of back pain (and other symptoms relating to his back injury) constitutes cruel and unusual punishment in violation of the Eight Amendment of the United States Constitution.

5. The actions (and or , lack thereof), of Dr. Garth Gulick and Dr. Lisa Koltes to plaintiff's serious medical needs evidences that an easier and less efficacious treatment was contentiously chosen and administrated by the doctors, and is an example of unconstitutional deliberate indifference to prisoner's medical needs, and in this case constitutes cruel and unusual punishment in violation of the Eight Amendment of the United States Constitution.

6. The actions of Dr. Garth Gulick's and Dr. Lisa Koltes' presistence in a course of treatment kown to be ineffective,in plaintiff's case, coupled with  the sheer number of specific instances in witch both doctors insisted on continuing courses of treatment that they knew to be unnecessarily painful to the plaintiff, ineffective, -and or- entailed substantial risk of further injuring to the plaintiff or causing additional harms  constitutes cruel and unusual punishment in violation of the Eight Amendment of the United States Constitution.

7. The actions (and, or lack thereof) of both doctors Garth Gulick and Lisa Koltes which caused plaintiff to suffer in an extreme and gross amount of pain caused by and exacerbated by perpetuated spinal/nerve damage in plaintiff's back (while well informed of plaintiff's back-injury and the severity of his condition), without the proper and adequate treatment these physicians knowingly know plaintiff was in serious medical need of. These sworn physicians, Dr. Garth Gulick and Dr. Lisa Koltes, knowingly allowed the plaintiff's condition to diminish greatly while under their care, and too go inadequately treated for over (two) 2-years before plaintiff received his first, of likely multiple, surgery(s), which  constitutes cruel and unusual punishment in violation of the Eight Amendment of the United States Constitution.

CIVIL RIGHTS COMPLAINT (§1983)                                                    83

8. The failure of both doctors Garth Gulick and Lisa Koltes to act after plaintiff reported the "horrendous" pain in his back caused by simply walking, pain worsening with ordinary and daily benign movements, and descriptions of reproducible single and bilateral leg symptoms that worsen after standing or walking for more than several minutes, and at times relieved by sitting (termed: *Neurogenic Claudication.* Further evidencing physicians cognizance of plaintiff's serious condition, plaintiff *often* exhibited limited extension of the lumbar spine (a fact which may arise in further proceedings as a dispute of-and-in the facts), which would reproduce the symptoms radiating down plaintiff's  leg (generally his left leg). Be that all of these symptoms occurred -at some point before the inevitable, the competent and objective course of treatment would and should have been that the plaintiff receive a through neurovascular examination (this is pursuant to the "Current Medical diagnosis and treatment manual" written and published by LANG/ Mc'Garw and Hill Education), thereby supports a claim of inadequate treatment and deliberate indifference which constitutes cruel and unusual punishment in violation of the Eight Amendment of the United States Constitution.

9. The actions of Dr. Peng erroneously and prematurely canceling plaintiff's pain medications prescribed by Meridian Park Hospital's E.R. Doctor, only hours after plaintiff's fall from a bunk ladder -sustaining spinal and elbow injuries. Dr. did this well by for ever meting and or first evaluating plaintiff. Too, without first evaluating the plaintiff's condition, Dr. Peng's inclined to cancel plaintiff's order for a wheel-chair, and forcing him to walk with walker before plaintiff felt ready, after it had already been recommended that plaintiff be placed on bed rest, and too remain as immobilized  as much as possible over the next few days. Dr. Peng's blatant choice not to deal with taking the substantial steps toward initiating the process of setting-up -and or- scheduling plaintiff's physical therapy (as also recommended by the E.R. Doctor), when

combined, equates deliberate indifference, and  in violation of the Eight Amendment of the United States Constitution.

10. The actions of defendant Nurse Brady (medical personnel of C.C.I.C) treating the plaintiff as a nu-sense and with disdain, then threatening plaintiff with the cruel and unusual punishment of forcing him to walk after she took his wheel-chair away, only hours after plaintiff's fall from the bunk-ladder, when she well knew that the E.R. discharge recommendations were for plaintiff to be placed on observation and bed rest, and to and too remain as immobilized  as much as possible over the next few days. Thus, evidences cruel and unusual punishment in violation of the Eight Amendment of the United States Constitution.

11. The failure of defendant Dr. D. Brown to act once notified that personnel of his medical team had treated the plaintiff with deliberate indifference by not responding to correctional officer's numerous calls for emergency medical assistance, consistently, for close to five 5-hours, when Dr. Brown had the choice to exercise his authority to reprimand his personnel -and or- attempt rectification of the matter, but chose not to do so should prove deliberate indifference which constitutes cruel and unusual punishment in violation of the Eight Amendment of the United States Constitution.[21]

12. The failure of Paula Myers (C.C.I.C warden) to enforce proper maintenance provisions allowed the hand rails in handicapped cell to go unchecked, after prior notification, which subsequently caused plaintiff additional injury when it came completely free from the wall as he careened of the ladder and reached for the rail seeking support -but the rail malfunctioned and failed exacerbating plaintiff's fall as he crashed onto the cold concrete floor, but not before smashing

---

21  When it was brought to Dr. brown's attention that plaintiff's only means of mobility and transportation was taken away from him without cause, he failed too act -which also is evidence to deliberate indifference which constitutes cruel and unusual punishment in violation of the Eight Amendment of the United States Constitution.

CIVIL RIGHTS COMPLAINT (§1983)                                                                 85

spine first onto the stainless steel toilet, further complicating plaintiff's preexisting condition. Not was it found that only one hand rail was loose improperly maintained and insecure, but at the very least, a second hand rail was found to be in the same or similar improperly maintained conditions when plaintiff was reassigned to the handicapped cell next door to were the first rail malfunctioned, and the hand rail in that second cell was also very loose and unstable. Plaintiff felt obligated to inform the unit officer (Ms. Robles) of the fact, and subsequently a "work order" to fix the rail was submitted shortly there after. ("prisoners are entitled to shelter which does not...threaten [their] mental or physical well being".) *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir.1980). *Helling v. McKinney*, 509 U.S. 25, 35, 113 S. Ct. 2475 (1993) (Eight Amend. Barrs exposure, with deliberate indifference, to condition 'that pose an unreasonable rick to serious damage to [the plaintiff's] future health."). Thereby, defendant Myers' conscious choice not to address the matter of ill-functioning hand rails, evidences cruel and unusual punishment, and supports plaintiff's claim of deliberate indifference in violation of the Eight Amendment of the United States Constitution.

13. The failure of defendant Braid Cain, Superintendent of Snake river Correctional Institution, to take action in the matter once notified of the magnitude of plaintiff's precarious medical condition, and insure plaintiff was provided proper and adequate medical care constitutes deliberate indifference in violation of the Eight Amendment of the United States Constitution.

14. The actions of defendant J. Bughr, B. Greesbale, and Mr. Geeir (all administrative officers of O.D.O.C Medical Health Services) intercepting plaintiff's correspondences addressed to Mrs. Colette S. Peters (Direrter of O.D.O.C), an administrative head with the power and authority to force the proper medical personnel at Snake River Correctional Institution to provide adequate medical care for the plaintiff's serious medical needs; and or, defendant's failure to insure the

plaintiff's medical concerns (as stated in his numerous correspondences to Medical
Administration) were properly addressed by whatever means necessary, by either themselves or
the intended recipient denied plaintiff's right to due process, thereby constituting a violation of
the Fourteenth Amendment of the United States Constitution; too, constitutes deliberate
indifference in violation of the Eight Amendment of the United States Constitution.

15. Defendant Colette S. Peters (Director of O.D.O.C) in her failure to take action in the matter
once notified of the magnitude of plaintiff's precarious medical condition, and insure plaintiff
was provided proper and adequate medical care, and coherently choosing to delegate the task to
subordinates whom she know would  handled the matter with arbitrary apathy constitutes
deliberate indifference in violation of the Eight Amendment of the United States Constitution.

16. The failure of defendant Dr. Joe De'Foe to take action in the matter once notified of the
magnitude of plaintiff's precarious medical condition, and insure plaintiff was provided proper
and adequate medical care constitutes deliberate indifference in violation of the Eight
Amendment of the United States Constitution.

17. The fail of defendant Nurse (Medical Services Manager) Landevete to take action in the matter
once notified of the magnitude of plaintiff's precarious medical condition, and insure plaintiff
was provided proper and adequate medical care constitutes deliberate indifference in violation
of the Eight Amendment of the United States Constitution.

18. The fail of defendant (Medical Services Manager) A. Hughes to take action in the matter once
notified of the magnitude of plaintiff's precarious medical condition, and insure plaintiff was
provided proper and adequate medical care constitutes deliberate indifference in violation of the
Eight Amendment of the United States Constitution.

19. The failure of defendant Nurse Wick (R.N.) and Nurse Nicholles to properly address plaintiff's serious medical needs caused additional and an unnecessary infliction of pain and suffering, which constitutes deliberate indifference in violation of the Eight Amendment of the United States Constitution; too include  violation of the Fourteenth Amendment of the United States Constitution by defendant's  denial of plaintiff's right to due process through the intentional interference of plaintiff's medical treatment once prescribed.

20. The action of officer McNitt and officer Ms. Shepard (Snake River Correctional Institution Correctional Officers) intentionally denying plaintiff's access to medical care,and or, intentionally interfering with plaintiff's treatment once prescribed, and or, ordered by both medical personnel and their superior officers of  S.R.C.I Security, evidences cruel and unusual punishment, also constitutes deliberate indifference in violation of the Eight Amendment of the United States Constitution.

21.  The failure of defendants within the T.L.C (therapeutic Level  of Care) committee, while possessing the authority, to sign off that plaintiff receive the proper and necessary level of medical treatment once notified of the severe magnitude of plaintiff's precarious medical condition, and insure plaintiff was provided proper and adequate medical care; too, the actions of T.L.C. Committee and members erroneously and arbitrarily denying plaintiff's Neurosurgeon's prescribed course of medical treatment, without cause or reasons of objectivity found constitutes deliberate indifference in violation of the Eight Amendment of the United States Constitution.

22. The actions of defendant S. Mecham's arbitrary response to plaintiff's correspondence in  regard to his concerns for his serious medical needs, and S. Mecham's *lack* of action to properly handle the matter by allowing the intended recipient to address the issue forthwith -while assuring the

CIVIL RIGHTS COMPLAINT (§1983)                                            88

plaintiff received adequate medical  treatment (instead of allowing Superintendent Braid Cain, the authority in which plaintiff's correspondence was addressed to, respond and take action.), denied plaintiff's right to due process, thereby constituting a violation of the Fourteenth Amendment of the United States Constitution; too, constitutes deliberate indifference in violation of the Eight Amendment of the United States Constitution.

23. The actions of defendants; J. Bughr, B. Greesbael, and Mr. Geeir (officers of Health Services Administration) in their responding with inadequate written replies to plaintiff's correspondences, instead of allowing Director Colette Peters (who was the intended recipient) to address the matter is an abridgment of plaintiff's right to due process, thereby constituting a violation of the Fourteenth Amendment of the United States Constitution.

24. The actions of defendants Jane Doe and John Doe (No.2), not promptly notifying the proper authorities to the fact that plaintiff was suffering from a well documented serious medical need, and that it was logged in plaintiff's medical records that Dr. Angelina Platas, MD. Had ordered that plaintiff's be restricted from being housed on upper-bunks/upper-tiers (a.k.a "lower-lower" by O.D.O.C/medical personnel), the subsequent result of that failure ending with; plaintiff being wrongfully forced on a top-buck for well over a week, plaintiff's subsequent fall from the bunk ladder, further injury(s) sustained, spinal surgery, residual harm -too include the possibility of permanent spine damage, with further corrective medical procedures needed denied plaintiff's right to due process, thereby constituting a violation of the Fourteenth Amendment of the United States Constitution; too, constitutes deliberate indifference in violation of the Eight Amendment of the United States Constitution.

25. The action of defendant Nurse Aja Villareal (personnel of Medical Health Services at C.C.I.C) passing on erroneous hearsay as fact in here medical notes/reports (plaintiff's permanent

medical file), and causing unnecessary and unjust adversity to reflect on plaintiff's credibility when asserting his serious medical needs and claims; too include defendant Villareal's failure to rectify the matter or make the attempt at absolving plaintiff's medical file is an act constituting deliberate indifference and cruel and unusual punishment in violation of the Eight Amendment of the United States Constitution.

26. The false allegations of John/Jane Doe to Nurse Aja Villareal, that plaintiff had been observed " "per unit officer, Pt. [plaintiff] has been walking in the unit without walker and without issue." Thereby, causing slander and defamation to plaintiff's character, which has inevitably compromised plaintiff's credibility with medical authorities, and adversely effects plaintiff's right to equal access to receiving an adequate level of care and medical treatment supports not only plaintiff's claim of abridgment of his right to due process, right to equal protection of law in violation of the Fourteenth Amendment of the United States Constitution; but should also deliberate indifference and cruel and unusual punishment in violation of the Eight Amendment of the United States Constitution.

All parties shall not be limited to liability for claims asserted herein, but are subject to any and all claims (such as: tort claims constituting negligence, malpractice, etc.) under the law of the state of Oregon, and as they may apply -or as deemed to fit pursuant to court rules.

SIGNED: _____ .DATE: July -12TH- 2019.

NAME: Rico C. Newmann

Sid#: 12399798

ADDRESS: 777 Stanton, Blvd,

Ontario, Ore,

97914 -

CIVIL RIGHTS COMPLAINT (§1983)                    90

RELIEF
## ~~RELEIEF~~ REQUESTED

Wherefore, Plaintiff (RICO CARLOS NEWMANN), respectfully requests that this court grant the following:

### A. ISSUE A DECLARATOR JUDGMENT STATING THAT:

1) The physical injury sustained by the plaintiff after his fall from the bunk ladder, after it was known by defendants that he should not have been there, violates plaintiff's rights under the Eighth Amendment of the United Stats Constitution and cruel and unusual punishment under state and federal law.

2) The defendants Dr. Garth Gulick in concert therewith Dr. Lisa Koltes allowing plaintiff's initial injury[22] and serious medical condition to go inadequately treated for such an unreasonable extended period of time is evident and blatant deliberate indifference and violates plaintiff's rights under the Eighth Amendment of the United Stats Constitution and cruel and unusual punishment under both state and federal law.

3)  The defendant Dr. Lisa Koltes' action of conducting a rectal examination in relation to plaintiff's adamant claims of a back injury was unnecessary and a gross intentional infliction of physical and emotional pain, and did not embody the objective and "broad and idealistic concepts of dignity, civilized standards, humanity, and decency..." as suggested in *Jackson v. Bishop*, 404 F.3d 571,579 (CA8 1968), and constitutes cruel and unusual punishment violating plaintiff's rights under the Eighth Amendment of the United Stats Constitution and cruel and unusual punishment under both state and federal law.

4) The defendant Dr. Garth Gulick's retaliatory action of spiteful denial and refusal to address plaintiff's serious medical need of treatment for his diminishing spinal stenosis is an unnecessary and gross infliction of pain, and constitutes cruel and unusual punishment violating plaintiff's rights under the Eighth Amendment of the United Stats Constitution and cruel and unusual punishment under both state and federal law.

5) The defendants within the Therapeutic Level of Care Committee's joint decision to knowingly allow the plaintiff's to continuously suffer in extreme pain, and to allow his precarious condition to diminish severely over an extended period of time, fostering further and possible permanent damage in the plaintiff's spine (and or, nerve damage) is an unnecessary and gross infliction of pain, and constitutes cruel and unusual punishment violating plaintiff's rights under the Eighth Amendment of the United Stats Constitution and cruel and unusual punishment under both state and federal law.

6) The O.D.O.C Administrative defendants failure to to take proper action to curb the inadequate medical treatment being exerted upon the plaintiff by their subordinates, Dr. Gulick and Dr. Koltes (et al.) once notified, violates plaintiff's rights under the Eighth Amendment of the United States Constitution, and constitutes deliberate indifference.

7) Defendant Nurse Carr's blatant disregard for plaintiff's serious medical needs and concerns for his condition is a gross display of deliberate indifference, and lack of regard and reverence for the inherent servitude obliging all medical personnel to provide proper and adequate care and

---

22 Injury sustained from lifting a mop bucket full of water during plaintiff's work detail, in the early summer of 2016.

treatment to all patients -irregardless the fact that one may so happen to be an inmate, which is an unnecessary and gross infliction of pain, and constitutes cruel and unusual punishment violating plaintiff's rights under the Eighth Amendment of the United Stats Constitution and cruel and unusual punishment under both state and federal law.

## B. ISSUE AN INJUNCTION ORDERING DEFENDANT'S WITH IN THE O.D.O.C THERAPEUTIC LEVEL OF CARE COMMITTEE/DR. GULICK/DR. LISA KOLTES, et al. To:

1)       Immediately arrange for plaintiff's spinal stenosis be evaluated by a back specialist that is not in correlation or contracted by O.D.O.C, and the conclusion of plaintiff's condition be remedied as needed.

2)       Immediately arrange for plaintiff's other assorted back issues/injuries be reevaluated by a specialist, and any necessary surgery be commenced forthwith, as needed.

3)       immediately provide proper Physical Therapy -other than the inadequate treatment that has been provided thus far (such as the ill-functioning 'bike' peddaled contraption that was infrequently provided  to the plaintiff.

4)       carry out, without delay, all treatment/prescriptions/orders/ and recommendations directed by the new uncorrelated back specialist

## C. AWARD COMPENSATORY DAMAGES IN THE FOLLOWING AMOUNTS:

1)       \$250,000.00 JOINTLY AND SEVERELY AGAINST DEFENDANTS; Dr. Garth Gulick, Dr. Lisa Koltes, Brad Cain, Dr. Joe DeFoe, All T.L.C. Committee members, and M.S.M, Nurse Landerverde for knowingly allowing the plaintiff to suffer from a physical injury which caused a serious medical need, which was also allowed to go inadequately treated for over (2) two years, an unnecessary and gross extended period of time[23].

2)       \$200,000.00 jointly and severely against defendant's; Dr. Garth Gulick, Dr. Lisa Koltes, Superintendent Braid Cane, Dr.Joe DeFoe, all relevant T.L.C Committee members, M.S.M, Nurse Landdeverde, et al. For knowingly allowing the plaintiff medical condition to degenerate to the point surgery was (and is further) needed, and permanent damage has followed

3)       \$250,000.00  jointly and severely against defendant's; Paula Myers(warden), Dr. Brown, John/Jane Doe for the physical injuries plaintiff sustained after falling from a top bunk-ladder, after plaintiff was doctor ordered to be restricted from being assigned to top bunks/top tiers, and defendant's were placed on notice of this fact.

4)       \$200,000.00  jointly and severely against defendant's; Lisa Koltes, Garth Gulick, all relevant T.L.C Committee members, Braid Cain, Paula Myers, (Nurse) Carr, (Nurse) Gillmore-Angels, (Nurse) Brady, Joe Defoe, (Dr. Peng), (Officer) McNitt, (Officer) Shepard, (M.S.M) Landerverde, (Dr.) Brown, J. Bughr, (M.S.M) A. Hughes, (Nurse) Wick, (Nurse) Nicholles, (Nurse) Aja Villareal, B. Greesbael, (Mr.) Geeir, John Doe(#1), John Doe(#2), and Jane/John Doe(#3) for the psychological and emotional injuries sustained as a direct result of plaintiff's physical injuries, and the entirety of this unnecessary and traumatizing ordeal.

5)       \$100,000.00 jointly and severely against defendants;  Lisa Koltes, Garth Gulick, all

---

23  Too include all other defendants for which this assertion may apply.

relevant T.L.C Committee members, Braid Cain, Paula Myers, (Nurse) Carr, (Nurse) Gillmore-Angels, (Nurse) Brady, Joe Defoe, (Dr. Peng), (Officer) McNitt, (Officer) Shepard, (M.S.M) Landerverde, (Dr.) Brown, J. Bughr, (M.S.M) A. Hughes, (Nurse) Wick, (Nurse) Nicholles, (Nurse) Aja Villareal, B. Greesbael, (Mr.) Geeir, John Doe(#1), John Doe(#2), and Jane/John Doe(#3) for the deprivation of liberties, and the humiliation causing severe emotional stress sustained as a direct result of plaintiff's confinement to a wheel chair, and or, other needed devices too aid in his mobility. Which has been for a very long and extended period of time, and continues to this day...

6)    $1-million jointly and severely against defendants;  Lisa Koltes, Garth Gulick, all relevant T.L.C Committee members, Braid Cain, Paula Myers, (Nurse) Carr, (Nurse) Gillmore-Angels, (Nurse) Brady, Joe Defoe, (Dr. Peng), (Officer) McNitt, (Officer) Shepard, (M.S.M) Landerverde, (Dr.) Brown, J. Bughr, (M.S.M) A. Hughes, (Nurse) Wick, (Nurse) Nicholles, (Nurse) Aja Villareal, B. Greesbael, (Mr.) Geeir, John Doe(#1), John Doe(#2), and Jane/John Doe(#3) for the unnecessary and preventable residual harm to adversely effect the plaintiff's future, both economically and non-economically, which has been caused by permanent damage to plaintiff's spine, and or, permanent nerve damage.

7)    7) $25,000.00 against defendant's: Jane/John Doe(#3), S. Mecham (subordinate of Brad Cain), B. Greesbael, J. Bughr, and Mr. Geeir for the deprivation of plaintiff's liberties by denial of his right to due process, in connection with the plaintiff's right to seek aid and assistance from either or both medical and administrative authority. This subsequently and adversely led toward  perpetuating plaintiff's preexisting serious medical need for treatment, if not simply led toward causing plaintiff to sustain additional injury(s).

## D. AWARD PUNITIVE DAMAGES, BOTH JOINTLY AND SEVERELY, IN THE FOLLOWING AMOUNTS:

1) $50,000.00 against defendants; Braid Cain, Paula Myers, Landerverde, (Dr.) Brown, J. Bughr, (M.S.M) A. Hughes, (Nurse) Wick, (Nurse) Nicholles, (Nurse) Aja Villareal, John Doe(#1), and Jane/John Doe(#3)-et al;

2) $250,000.00  against defendants; (Nurse) Carr, (Nurse) Gillmore-Angels, (Nurse) Brady; Joe Defoe, (M.S.M) Landerverde, (M.S.M) A. Hughes;

3) $250,00.00 against defendants; (Dr.) Brown, (Dr. Peng), and John doe(#2)-et al.

4) $750,000.00 against defendant; (Dr.) Garth Gulick;

5) $1,000,000.00 against defendant (Dr.) Lisa Koltes;

6) $2,500,000.00 against all relevant parties of the Therapeutic Level of Care Committee (T.L.C).

7) $25,000.00 against defendant's: Jane/John Doe(#3), S. Mecham (subordinate of Brad Cain), B. Greesbael, J. Bughr, and Mr. Geeir for the deprivation of plaintiff's liberties by denial of his right to due process, in connection with the plaintiff's right to seek aid and assistance from either or both medical and administrative authority. This subsequently and adversely led toward  perpetuating plaintiff's preexisting serious medical need for treatment, if not simply led toward causing plaintiff to sustain additional injury(s).

**F.** (*alternatively*) **ADWARD PRESUMED  DAMAGES IN THE AMOUNT TOTALING:**
   1) $4,800,000.00/$4.8-MILLION;

a) presumed damages are designed to to "roughly approximate the harm that the plaintiff has suffered, and thereby compensate for harms that may be impossible to measure" *Memphis County School District v. Stachura*, 477 u.S. 299, 310, 316, 106 S. Ct. 2537 (1986).

b) the amount of presumed damages requested are in part based on defendant's failure to arbitrate, and or, reconcile this matter at an earlier point in time, nor heed any of attempts made to rectify these issues, but on the contrary, chose to exacerbate the circumstances by allowing the matter to go on unresolved for now approaching (three) 3-years, and in to these subsequent court proceedings. a number of past cases have had similar damages awarded.[24]

## CONCLUSION

1)      awarding plaintiff compensatory damages for the unnecessary deterioration of his physical condition, permanent spine/nerve damage and consequential physical pain and emotional suffering, in an amount as yet to be deduced from the evidence, but in no event in an amount less than $4.8 million, or in the max amount deemed proper as pursuant to provisions of ORS 30.271 §3(g) -§4; and

2)      Any other relief that this court may deem just and proper.

3)      Trial by jury is hereby demanded on all claims alleged herein, and the parties are hereby given notice, pursuant to fed. R. Civ. P. 38(a-c).

respectfully submitted this _____th day of July, 2019.

SIGNED: _____ .DATE: July -12th- 2019.

NAME: Rico C. Newmann
Sid#: 12397798
ADDRESS: 777 Santon, Blvd
Ontario, Ore.
          97914 -

_____

[24]which is too include the outcome of a very resent case that was settled in September of 2018 for $1-million (*Telford v. County of Kings*, King County Superior Court (WA), Case No. 17-2-23074-0-SEA. A case with great parallel and many similarities. As plaintiff in this matter finds, one of the main differences in circumstances is that Mr. Brain Telford suffer approximately (ten) 10-days before he was finally allowed to have am M.R.I -and subsequent surgery commencing shortly after, plaintiff in this matter at bar was forced to suffer a *great* deal longer, and continues to suffer to this day...

CIVIL RIGHTS COMPLAINT (§1983)                                    94

**CERTIFICATE OF SERVICE**

CASE NAME: __NEWMANN__ v. __OREGON DEPARTMENT OF CORRECTIONS -(O.D.O.C)__
et al.

CASE NUMBER: (if known) _____

COMES NOW, __Rico Carlos Newmann__, and certifies the following:

That I am incarcerated by the Oregon Department of Corrections at __Snake River Correctional Institution__.

That on the 12th day of __July__, 20 19, I personally placed in the Correctional Institution's ~~mailing~~ E-FILING service A TRUE COPY of the following:

__Plaintiff's (Pro-SE) U.S.C §1983 Civil Rights Complaint w/ Attachments — in all, totaling 94- Pgs.__

I placed the above ~~in a~~ securely ~~enclosed, postage prepaid envelope~~ IN THE HANDS OF S.R.C.I. LEGAL COORDINATOR FOR E-FILING, to the person(s) named at the places addressed below:

__Brad Cain, Paula Mayers, Colette Peters, T.L.C Committee Members, Joe DaFoe, Christopher Dibiuzio, Monica Landaverde, Aimee Hughes, Correth Coulick, Lisa Koltes, Dr. Peng, Dr. Brown, Nicole Carr, Vishami Brady, J. Gillmore-Angels, Asia Villarsal, Jackie Wick, Debi Nicholson, Joe Bugher, B. Careesbael, Mr. Caseir, Sheila Mecham, Rod McNitt, Kandy Shepard, John Doe#1, Jane/John Doe#2, And Jane/John Doe#3, et al.__

__All Persons Named Were Addressed To:__
                    __The Attorney General's Office.__

_(Signature)_

Print Name: __Rico Carlos Newmann__

SID No.: __12397798__

Address: __777 Stanton, Blvd.__
         __Ontario, Or. 97914__